[No. H032895. Sixth Dist. Apr. 29, 2010.]

SILVACO DATA SYSTEMS, Plaintiff and Appellant, v.
INTEL CORPORATION, Defendant and Respondent.

212

**COUNSEL**

Dechert, Chris Scott Graham, Jill F. Kopeikin and Sarah Wager for Plaintiff and Appellant.

Orrick, Herrington & Sutcliffe, Chris R. Ottenweller, Michael C. Spillner, Robert S. Shwarts; Janet M. Craycroft and Tanya Hunter for Defendant and Respondent.

**OPINION**

**RUSHING, P. J.**—Plaintiff Silvaco Data Systems (Silvaco) brought this action against defendant Intel Corporation (Intel) alleging that the latter had misappropriated certain trade secrets used by Silvaco in its software products. The primary gist of the claims was that Intel had used software acquired from another software concern with knowledge that Silvaco had accused that

concern of incorporating source code, stolen from Silvaco, in its products. The chief question presented is whether Intel could be liable for such use if, as was effectively undisputed, it never possessed or had access to the source code but only had executable, machine-readable code compiled by its supplier from source code. We answer that question in the negative. One does not, by executing machine-readable software, "use" the underlying source code; nor does one acquire the requisite knowledge of any trade secrets embodied in that code. We also join the trial court in concluding that Silvaco failed to plead a viable claim not based upon a misappropriation of trade secrets. Accordingly, we will affirm the judgment.

### BACKGROUND

Silvaco develops and markets computer applications for the electronic design automation (EDA) field, which covers the entire complex process of designing electronic circuits and systems. Among the various subcategories of EDA software are circuit simulators, which permit the designer to create a virtual model of a proposed circuit in order to test its properties before incurring the expense and delay of manufacturing a working prototype. Defendant Intel, a major developer and manufacturer of integrated circuits, is a user and purchaser of EDA software, including circuit simulators. According to Silvaco's complaint, Intel has also developed some EDA software for its own use.

Among Silvaco's software products is SmartSpice, an analog circuit emulator. In December 2000, Silvaco filed a suit against Circuit Semantics, Inc. (CSI), a competing developer of EDA software, alleging that CSI, aided by two former Silvaco employees, had misappropriated trade secrets used in SmartSpice, and had incorporated them in its own product, DynaSpice. Silvaco eventually secured a judgment against CSI, including an injunction against the continued use of "technology" described in an exhibit attached to the judgment. It then brought actions against several purchasers of CSI software, including Intel.[1] It alleged that *by using CSI's software*, these end users had misappropriated the Silvaco trade secrets assertedly incorporated in that software. Silvaco charged Intel with misappropriation of trade secrets under California's Uniform Trade Secrets Act, Civil Code sections 3426 through 3426.11 (CUTSA), as well as with conversion, conspiracy, and violations of the unfair competition law, Business and Professions Code section 17200 et sequitur (UCL).

---

[1] One of these matters was previously before this court on an issue concerning the correct application of the statute of limitations. (*Cypress Semiconductor Corp. v. Superior Court* (2008) 163 Cal.App.4th 575 [77 Cal.Rptr.3d 685].) At least two others have been decided. (*Silvaco Data Systems v. Cirrus Logic, Inc.* (Apr. 29, 2010, H032802) [nonpub. opn.]; *Silvaco Data Systems v. Agilent Technologies, Inc.* (Apr. 29, 2010, H032835) [nonpub. opn.].)

Intel generally demurred to all causes of action. A series of challenges and amendments followed, culminating in the sustaining of demurrers to all of Silvaco's non-CUTSA causes of action on the ground, among others, that they were "preempted" by CUTSA.[2] Intel then moved for summary judgment on the CUTSA claim, arguing that (1) CUTSA defines "misappropriation" in a way requiring the plaintiff to show that the defendant possessed "knowledge of the trade secret" (Civ. Code, § 3426.1, subd. (b)),[3] and (2) there was no evidence that Intel ever possessed such knowledge.

In support of the motion Intel presented evidence that it never possessed the *source* code identified by Silvaco as constituting and containing its secrets, but only *executable* code supplied to it by CSI. The parties appear to agree, and we may accept for purposes of this opinion, that "source code" describes the text in which computer programs are originally written by their human authors using a high-level programming language.[4] (See *Cypress*

---

[2] Although this case was decided largely on the pleadings, it has somehow generated an appendix over 8,000 pages in length. Seldom have so many trees died for so little. We see three causes for this wretched excess. The first is the inclusion of hundreds of pages of printouts of legal authorities retrieved from online sources. The rules require that, for the convenience of trial judges, some such materials be "lodged" in the superior court when cited. (Cal. Rules of Court, rule 3.1113(i).) There is no requirement that they be included in the record on appeal, and ordinarily they have no place in it. (See Cal. Rules of Court, rule 8.124(b)(3)(A) [appendix not to include materials "unnecessary for proper consideration of the issues"].) This court can more easily retrieve authorities through its own resources than it can find them—or anything else—in an 8,000-page appendix.

A second cause of overkill is that each of the appendix's 27 volumes includes an index to the entire appendix. This would be a welcome convenience if not for the fact that the index is *103 pages long*—a bulk that, replicated 27 times, consumes more than one-third of the appendix. This remarkable feat is achieved by listing not only every distinct *filing* (see Cal. Rules of Court, rules 8.144(b)(1), 8.124(d)(1), 8.122), but every *exhibit or attachment* to each filing, resulting in page after page of references to exhibit titles, including lodged authorities (see preceding paragraph). This level of detail, when judiciously reserved for critical documents, might be of considerable assistance in navigating a complex record. However, when it enlarges an already overblown record to the present extent, it largely defeats the index's purpose.

The third source of unnecessary length is the duplicative inclusion of multiple copies of documents that were filed repeatedly in the superior court. We assume these duplicate filings were intended as a convenience to the trial court, but when they inflate a record to the present proportions they are hardly a convenience to us.

There are of course cases in which records this size, and many times this size, are unavoidable. But as the sheer size of the record increases, it becomes increasingly important for appellate counsel to take an active role in ensuring that the record is no larger, and no less easily navigated, than accuracy and necessity dictate. The present case appears to be one of those rare instances when, contrary to the maxim, superfluity *does* vitiate. (See Civ. Code, § 3537.)

[3] Except as otherwise specified, all further statutory citations are to the Civil Code.

[4] This is an accurate enough description where, as here, the facts conform to what one writer has called the "[s]tandard [programming] [s]cenario." (Felten, Source Code and Object Code (posted Sept. 4, 2002) <http://freedom-to-tinker.com/blog/felten/source-code-and-object-code> [as of Apr. 29, 2010] (Source Code and Object Code).) In this scenario, human programmers

*Semiconductor Corp. v. Superior Court, supra,* 163 Cal.App.4th 575, 580; *Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 218, fn. 3 [127 Cal.Rptr.2d 169, 57 P.3d 647].) One who possesses the source code for a program may readily ascertain its underlying design, and may directly incorporate it, or pieces of it, into another program. In order to yield a functioning computer application, however, source code must generally be translated or "compiled" into machine-readable (executable) code. After a program is compiled, it may still be represented as text, but the text is not readily intelligible to human beings, consisting of strings of binary (base 2) or hexadecimal (base 16) numbers.[5] For this reason, the source code for many if not most commercial software products is a secret, and may remain so despite widespread distribution of the executable program.

Intel cited discovery responses by Silvaco, and testimony by its agents and experts in this and related cases, to the effect that (1) the possession and use of DynaSpice in the form of executable object or binary code could not impart knowledge of any trade secrets embodied in the source code; and (2) Silvaco was unable to controvert Intel's evidence that it never possessed any of the source code from which DynaSpice was derived. In opposition Silvaco argued, first, that executable code incorporates the same "information" as the source code from which it is compiled, so that executing it on a computer constitutes "use" of any trade secrets reflected in the source code. Second it insisted that, quite apart from the *informational* content of the source code, the secrets claimed by it "include certain 'methods, techniques and algorithms" that were "contain[ed]" and "use[d]" in the executable code.

---

write a program in a high-level programming language; this source code is then processed through software known as a compiler to produce object code that may be executed on a machine. Departures from the standard scenario, however, are increasingly common. Another writer asserts that among programmers the terms "source" and "object" do not really describe "well-defined classes of code" but are "actually relative terms." (Touretzky, Source vs. Object Code: A False Dichotomy (draft version July 12, 2000) <http://www.cs.cmu.edu/~dst/DeCSS/object-code.txt> [as of Apr. 29, 2010].) He continues, "Given a device for transforming programs from one form to another, source code is what goes into the device, and object code (or 'target' code) is what comes out. The target code of one device is frequently the source code of another." (*Ibid.*) The upshot seems to be that the correct use of these terms reflects variables that may not have any particular legal significance. Here, the essential variable for legal purposes is the extent to which the code reveals the underlying design, i.e., the methods and algorithms used by the developer. (See Felton, *supra*, Source Code and Object Code [suggesting distinctions based on whether code is in " 'the form in which [programmers] customarily read and edit[] it' " and the extent to which it is "human-readable"].) The distinguishing feature for our purposes is that what the parties call "source" code is written by programmers and readily understood by them, whereas object or machine code is compiled by and for machines and does not readily yield its underlying design to human understanding.

 [5] For example, the instruction "MOV" for an Intel 32-bit microprocessor may be represented as "10110000 01100001" in binary code or "B0 61" in hexadecimal. (Wikipedia, The Free Encyclopedia, Assembly language <http://en.wikipedia.org/wiki/Assembly_language> [as of Apr. 29, 2010].)

Third it denied the premise, which it inaccurately attributed to Intel, that liability under CUTSA requires proof "that the misappropriator comprehend the trade secret." It quoted the statement from the unpublished decision of a federal district court in Utah that "understanding of the underlying code and algorithm is unnecessary for misappropriation. There is no requirement of comprehension of the trade secret to state a claim . . . under the Utah Trade Secrets Act . . . ." (*ClearOne Communications, Inc. v. Chiang* (D.Utah 2007) 2007 WL 4376125, p. *2 (*ClearOne*).) Finally, it suggested that by granting summary judgment the court would destroy the basis for its earlier conclusion that the non-CUTSA claims were preempted. Accordingly, it suggested, if the court was inclined to grant summary judgment it should, on its own motion, reconsider and vacate its orders sustaining Intel's demurrers.

The trial court granted Intel's motion for summary judgment, writing, "Intel has presented admissible evidence . . . that Silvaco has no evidence that Intel in fact acquired or possessed Silvaco's trade secrets (defined by Silvaco as source code), or that using CSI's software in executable code form somehow conveys knowledge of Silvaco trade secrets or equates to acquisition of trade secrets. [¶] . . . By acquiring the CSI software that 'embodies' Silvaco's source code, Intel did not acquire, or gain knowledge of, the information that constitutes Silvaco's alleged trade secret. . . . It is not the functionality of the CSI software that constitutes Silvaco's alleged trade secret, but Silvaco's means of creating that functionality through the source code."

The court entered judgment for Intel. Silvaco filed this timely appeal.

**DISCUSSION**

I. *Misappropriation of Trade Secrets*

A. *Question Presented*

Silvaco persistently misstates the central issue in the case by insisting, here and in related appeals, that the question presented is whether a defendant charged with trade secret misappropriation "may escape liability" by establishing that it "does not comprehend the specific information comprising the trade secrets." This is not an issue, let alone the chief issue, in these matters. The posited question may be answered in the negative—as indeed it must— without resolving any aspect of this case. It is a smokescreen, a red herring, a straw man.

Intel has never suggested that it should avoid liability merely because it failed to "comprehend" Silvaco's trade secrets. Indeed it has never suggested

that it would not have "comprehend[ed]" those secrets—had it ever seen them. Rather it asserts that it could not have misappropriated Silvaco's trade secrets—could not have acquired, disclosed, or used them—because it never *had* them. Since the evidence supporting this contention was effectively uncontroverted—there was no basis to find that Intel had access to either CSI's or Silvaco's source code—the contention presents a question of law: whether a defendant can be liable for misappropriation of a trade secret which is admittedly embodied in *source* code, based upon the act of executing, on his own computer, *executable* code allegedly tainted by the incorporation of design features wrongfully derived from the plaintiff's source code. It is undisputed that the object code executed by Intel could not disclose the underlying source code or permit the exploitation of its features and design. It could not, in short, impart knowledge of the trade secret. The question is whether, in such circumstances, Intel could be found to have misappropriated Silvaco's trade secrets. Silvaco has offered no coherent basis for an affirmative answer. To the extent such an answer is suggested by unpublished federal authorities, or authorities not decided under CUTSA, we decline to follow them.

### B. *Trade Secret*

■ A cause of action for monetary relief under CUTSA may be said to consist of the following elements: (1) possession by the plaintiff of a trade secret; (2) the defendant's misappropriation of the trade secret, meaning its wrongful acquisition, disclosure, or use; and (3) resulting or threatened injury to the plaintiff. (§ 3426.3; see §§ 3426.1, 3426.2.) The first of these elements is typically the most important, in the sense that until the content and nature of the claimed secret is ascertained, it will likely be impossible to intelligibly analyze the remaining issues.

■ CUTSA defines " '[t]rade secret' " to mean "*information*, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from *not being generally known* to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its *secrecy*." (§ 3426.1, subd. (d), italics added.)　■　The sine qua non of a trade secret, then, is the plaintiff's possession of information of a type that can, at the possessor's option, be made known to others, or withheld from them, i.e., kept secret. This is the fundamental difference between a trade secret and a patent. A patent protects an *idea*, i.e., an invention, against appropriation by others. Trade secret law does not protect ideas as such. Indeed a trade secret may consist of something we would not ordinarily consider an *idea* (a conceptual datum) at all, but more a *fact* (an empirical datum), such as a

customer's preferences, or the location of a mineral deposit. In either case, the trade secret is not the idea or fact itself, but *information* tending to communicate (disclose) the idea or fact to another. Trade secret law, in short, protects only *the right to control the dissemination of information.*

■ It is critical to any CUTSA cause of action—and any defense—that the information claimed to have been misappropriated be clearly identified. Accordingly, a California trade secrets plaintiff must, prior to commencing discovery, "identify the trade secret with reasonable particularity." (Code Civ. Proc., § 2019.210; see Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights* (2008) 61 Stan. L.Rev. 311, 344 [plaintiff should be required to "clearly define[] what it claims to own, rather than (as happens all too often in practice) falling back on vague hand waving"].) Pursuant to this requirement, Silvaco filed a document, under seal, designating the trade secrets claimed by it. The designation identified trade secrets in six categories, as further detailed in two attached exhibits. The first five categories, and the first exhibit, referred only to source code. The designation did not set forth the code itself, which presumably was voluminous, but referred to files that were contemporaneously produced on optical disks.

The sixth category of claimed trade secrets was described as "the . . . trade secrets identified in Exhibit B . . . *and* the source code implementing such trade secrets." (Italics added.) Exhibit B consists of 22 pages of technical verbiage most of which may be readily intelligible only to those within the EDA field. This much, however, seems reasonably clear: the exhibit does not designate *information* as such but rather describes various features, functions, and characteristics of the design and operation of Silvaco's software products. Thus the first of the 24 listed subcategories is a "proprietary *method*" of carrying out a function apparently found in competing programs as well. (Italics added.) This asserted secret is also described as "a methodology for" implementing that function, apparently in an unusual way, which "contributes [to] performance and accuracy improvements." This "trade secret methodology" is "implement[ed]" by two named "modules," also described as "functions," which "represent part" of the critical "algorithm." Three "unique features" of this method are listed: The "[i]ntegration" of two other operations; a "[m]ethod" of "changing and controlling" a variable, which "affects the performance of the simulation"; and a mode of "implementation" that produces "[e]fficiency."

Silvaco's sixth category thus appears to attempt to characterize various aspects of the *underlying design* as trade secrets. This of course contravenes the principles discussed above. The design may constitute the *basis* for a trade secret, such that *information concerning it* could be actionably misappropriated; but it is the information—not the design itself—that must form

the basis for the cause of action. And while the finished (compiled) product might have distinctive characteristics resulting from that design—such as improved performance—they cannot constitute trade secrets because they are not secret, but are evident to anyone running the finished program. Indeed, to the extent they tend to disclose the underlying design, *it* ceases to be a protectable secret for that same reason. The sixth category therefore fails to describe a trade secret other than source code. Since none of the other categories even purport to do so, Intel is quite correct to premise its argument on the proposition that the only trade secrets at issue are found in Silvaco's source code.

## C. *Misappropriation*

### 1. *Disclosure; Acquisition*

■ Under CUTSA, misappropriation of a trade secret may be achieved through three types of conduct: "[a]cquisition," "[d]isclosure," or "[u]se[]."[6] (§ 3426.1, subd. (b).) The act does not define these terms, but leaves their delineation to be adjudicated in light of the purposes and other provisions of the act. The question is whether Silvaco raised a triable issue of fact concerning Intel's commission of any of these three forms of conduct.

There is no suggestion that Intel ever *disclosed* Silvaco's source code to anyone, and it is difficult to see how it might have done so since there is no evidence that it ever had the source code to disclose. Silvaco emphasizes that wrongful *acquisition* of a trade secret may be actionable in itself. (See § 3426.1, subd. (b); *San Jose Construction, Inc. v. S.B.C.C., Inc.* (2007) 155 Cal.App.4th 1528, 1544 [67 Cal.Rptr.3d 54], fn. omitted [" 'misappropriation' can occur through improper *acquisition* of a trade secret, not only through use"].) But there is no basis to suppose that Intel ever "acquired" the source code constituting the trade secrets. To acquire a thing is, most broadly, to

---

[6] Section 3426.1, subdivision (b), provides: " 'Misappropriation' means:

"(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

"(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

"(A) Used improper means to acquire knowledge of the trade secret; or

"(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

"(i) Derived from or through a person who had utilized improper means to acquire it;

"(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

"(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

"(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake."

"receive" or "come into possession of" it. (1 Oxford English Dict. (2d ed. 1989) p. 115.) But the term implies more than passive reception; it implies pointed conduct intended to secure dominion over the thing, i.e., "[t]o gain, obtain, or *get as one's own*, to gain the ownership of (by one's own exertions or qualities)." (*Ibid.*, italics added; see *ibid.* ["acquisition" as "[t]he action of obtaining or getting for oneself, or by one's own exertion"].)

One does not ordinarily "acquire" a thing inadvertently; the term implies conduct directed to that objective. The choice of that term over "receive" suggests that inadvertently coming into possession of a trade secret will not constitute acquisition. Thus one who passively receives a trade secret, but neither discloses nor uses it, would not be guilty of misappropriation. We need not decide the outer limits of acquisition as contemplated by CUTSA, however, for there is no suggestion here of acquisition even in the broadest sense, i.e., that Intel ever came into possession of the source code constituting the claimed trade secrets. Indeed Silvaco does not directly argue that Intel acquired the trade secrets at issue but only that, under the terms of the statute, it *could* have done so without itself having "knowledge" of them. We doubt the soundness of this suggestion, but assuming it is correct, it remains beside the point unless Intel came into possession of the secret. Since there is no basis to find that it did, the mental state required for actionable acquisition appears to be academic.

### 2. *What Constitutes Use*

■ Silvaco has never explained how any conduct by Intel constituted "use" of its source code. Intel's only conduct in this matter, so far as the record shows, was to execute (run) the software it acquired from CSI— software which, according to Silvaco, "incorporated" or "contained" its trade secrets. We do not believe this can be viewed as a "use" of Silvaco's source code under CUTSA.

As it appears in the act, the noun "use" is surely intended in the ordinary sense, i.e., "[t]he act of *employing* a thing for any (esp. a profitable) purpose; the fact, state, or condition of being so employed; *utilization* or employment for or with some aim or purpose, *application or conversion* to some (esp. good or useful) end." (19 Oxford English Dict., *supra*, p. 350, italics added.) The term commonly implies, if not direct physical possession, at least a certain proximity or immediacy to the thing used. Indeed a common sense of the verb "to use" is "[t]o work, employ, or manage (an implement, instrument, etc.); to manipulate, operate, or handle, esp. to some useful or desired end." (19 Oxford English Dict., *supra*, p. 354.) Thus if one makes or receives a telephone call, he is said to "use" the telephone at his end of the call; but would not ordinarily be said to "use" the telephone at the receiving end—at least, not without qualification.

■ One clearly engages in the "use" of a secret, in the ordinary sense, when one directly exploits it for his own advantage, e.g., by incorporating it into his own manufacturing technique or product. But "use" in the ordinary sense is not present when the conduct consists entirely of possessing, and taking advantage of, *something that was made* using the secret. One who bakes a pie from a recipe certainly engages in the "use" of the latter; but one who eats the pie does not, by virtue of that act alone, make "use" of the recipe in any ordinary sense, and this is true even if the baker is accused of stealing the recipe from a competitor, and the diner knows of that accusation. Yet this is substantially the same situation as when one runs software that was compiled from allegedly stolen source code. The source code is the recipe from which the pie (executable program) is baked (compiled). Nor is the analogy weakened by the fact that a diner is not ordinarily said to make "use" of something he eats. His metabolism may be said to do so, or the analogy may be adjusted to replace the pie with an instrument, such as a stopwatch. A coach who employs the latter to time a race certainly makes "use" of it, but only a sophist could bring himself to say that coach "uses" trade secrets involved in the manufacture of the watch.

■ Strong considerations of public policy reinforce the commonsense conclusion that using a product does not constitute a "use" of trade secrets employed in its manufacture. If merely running finished software constituted a use of the source code from which it was compiled, then *every* purchaser of software would be exposed to liability if it were later alleged that the software was based in part upon purloined source code. This risk could be expected to inhibit software sales and discourage innovation to an extent far beyond the intentions and purpose of CUTSA. We therefore decline to hold that under the circumstances alleged and shown here, the mere execution of a software product constitutes "use" of the underlying source code for purposes of a misappropriation claim under CUTSA.

### 3. *Knowledge of the Trade Secret*

■ Even if Intel's use of DynaSpice could otherwise be held to constitute a misappropriation of the source code used to compile it, that conduct would only sustain liability if accompanied by the mental state prescribed by the statute—a mental state that defendant appears to have lacked. Of the five varieties of actionable "use" listed in the statute, four unmistakably require the defendant to have "knowledge of the trade secret." (§ 3426.1, subd. (b)(2)(A) ["[u]sed improper means to acquire knowledge of the trade secret"]; *id.*, subd. (b)(2)(B) ["knowledge of the trade secret was . . . [¶] (i) [d]erived . . . ; [¶] (ii) [a]cquired . . . ; or [¶] (iii) [d]erived . . ."].) The fifth is arguably ambiguous on this point, in that it contemplates the defendant's actual or constructive awareness that "knowledge of [the trade secret] *had been*

*acquired* by accident or mistake." (§ 3426.1, subd. (b)(2)(C), italics added.) The use of the passive voice here leaves open the possibility that a defendant might be liable, though himself lacking knowledge of the trade secret, if he "used" it with knowledge that *another*, on whom his use somehow depended, had acquired knowledge of it as a result of accident or mistake.[7] It is not easy to conceive how this might occur in real life. In any event it is not necessary to address the possibility at present because there is no suggestion that Silvaco's claims might be brought within this clause of the statute. Therefore, in order to prevail against Intel on its CUTSA claim, Silvaco was obliged to establish that Intel had "knowledge of the trade secret."

Silvaco's main argument on appeal may be reduced to the following essential premises: (1) Intel's argument for summary judgment is that it could not misappropriate the claimed trade secret because it lacked any knowledge of the source code constituting that trade secret. (2) This is tantamount to a contention that it did not *comprehend* the source code, or did not know its details. (3) CUTSA does not require that a defendant comprehend a trade secret or possess all its details in order to be liable for misappropriating it. (4) Therefore the essential premise of Intel's defense fails, and the trial court erred by sustaining that defense.

This argument might bear more weight if not for the yawning gap between the first and second premises. A requirement of "knowledge of the trade secret" simply is not a requirement that the defendant "comprehend" the secret, or learn its "details."[8] Intel relies on the premise that it lacked the requisite "knowledge." This is equivalent to an assertion that it never *possessed the information* constituting the trade secret. Intel has never relied on the proposition that it merely lacked "comprehension" of the secret. That premise is an invention of Silvaco's.

■ "Knowledge," of course, is "[t]he fact or condition of knowing," (italics omitted) and in this context, "[t]he fact of knowing a thing, state,

---

[7] Nothing said here should be taken to suggest that a defendant cannot be liable for misappropriation unless he *personally* possessed knowledge of the trade secret. He can of course acquire such knowledge, and indeed can conduct the entire misappropriation, *vicariously*, e.g., through an agent. Further, *constructive* knowledge of the secret may well be sufficient, at least in some circumstances. Thus one who knowingly possesses information constituting a trade secret cannot escape liability merely because he lacks the technical expertise to understand it, or does not speak the language in which it was written.

[8] Strained is too small a word to describe Silvaco's argument. The reference to "details" might at least be justified by noting Intel's assertion in support of summary judgment that CUTSA requires "that a defendant have knowledge of the content *and specific details* of the trade secret." (Italics added.) But we see no reference by Intel to any "comprehension requirement," even though Silvaco goes so far as to place that phrase, prominently and repeatedly, in quotation marks.

etc. . . ." (8 Oxford English Dict., *supra*, p. 517.) To "know" a thing is to have information of that thing at one's command, in one's possession, subject to study, disclosure, and exploitation. To say that one "knows" a fact is also to say that one *possesses information* of that fact. Thus, although the Restatement Third of Unfair Competition does not identify knowledge of the trade secret as an element of a trade secrets cause of action, the accompanying comments make it clear that liability presupposes the defendant's "possession" of misappropriated information.[9] (Rest.3d, Unfair Competition, § 40, com. d, p. 457 ["To subject an actor to liability under the rules stated in Subsection (b)(2)–(4), the owner need not prove that the actor knew that *its possession of the trade secret* was wrongful; it is sufficient if the actor had reason to know. Thus, if a reasonable person in the position of the actor would have inferred that *he or she was in wrongful possession* of another's trade secret, the actor is subject to liability for any subsequent use or disclosure. A number of cases also subject an actor to liability if, based on the known facts, a reasonable person would have inquired further and learned that *possession of the information* was wrongful." (Italics added.)]; see *id.*, com. d, p. 465 ["When the defendant knows that *its possession of the secret* is improper, it is subject to liability for any subsequent use or disclosure."]; *id.*, com. d, p. 466 [citing holdings that "a defendant is not liable for use or disclosure unless it knows or has reason to know that the *information in its possession* is a secret . . ." (italics added)]; *ibid.* [rule where "the defendant learns that it has unauthorized *possession of another's trade secret* only after a period of innocent exploitation" (italics added)].)

The record contains no evidence that Intel ever possessed or had knowledge of any source code connected with either SmartSpice or DynaSpice. So far as the record shows, Intel never had access to that code, could not disclose any part of it to anyone else, and had no way of using it to write or improve code of its own. Intel appears to have been in substantially the same position as the customer in the pie shop who is accused of stealing the secret recipe because he bought a pie with knowledge that a rival baker had accused the seller of using the rival's stolen recipe. The customer does not, by buying or eating the pie, gain knowledge of the recipe used to make it.

Silvaco offers no coherent argument for a contrary conclusion, but cites authority from other jurisdictions in which such a conclusion was apparently reached. It relies most heavily on *ClearOne, supra*, 2007 WL 4376125. According to an earlier decision explaining the court's issuance of a preliminary injunction, the case rested on allegations by the plaintiff, ClearOne, that two former employees had stolen ClearOne code and licensed it to defendant

---

[9] The Restatement is not, of course, a substitute for CUTSA, but it is intended to express principles reflecting the uniform act's proper application. (Rest.3d, Unfair Competition, § 39, com. b, pp. 426–427.)

Biamp. (*ClearOne Communications, Inc. v. Chiang* (D.Utah 2007) 2007 WL 3231524, pp. *1–*3.) Biamp moved to dismiss the complaint insofar as it rested on its use of object code, arguing that "(1) [it] never had knowledge of the allegedly misappropriated trade secret because it could not read the object code; and (2) the trade secret protections were destroyed because the 'object code . . . was freely distributed to Biamp [*sic*] customers without any secrecy restrictions.' " (*ClearOne, supra*, 2007 WL 4376125 at p. *2, citation omitted.)

On the issue of primary concern here—whether one can be said to possess the requisite "knowledge of the trade secret" when the secret consists of source code to which one has never had access—the court's analysis rests in part on the same straw man argument Silvaco uses here, which is to attribute to the moving defendant the patently unsound premise that the act requires "understanding" or "comprehension" of the trade secret (*ClearOne, supra*, 2007 WL 4376125 at p. *2) rather than, as it actually says, "knowledge" (Utah Code Ann., § 13-24-2; see Civ. Code, § 3426.1, subd. (b)(2)(A), (B)). The court acknowledged the act's actual text, but then dismissed it by conflating two distinct mental elements of liability: "Although the UTSA uses the phrase 'knowledge of the trade secret,' there is no authority that this phrase *creates an element of comprehension.* Rather, this phrase is generally understood to reflect knowledge that the trade secret was derived through improper means. See 2 Melvin F. Jager, Trade Secrets Law § 2:03 (explaining that under language identical to the UTSA, '[l]iability . . . attaches only in the event that it can be proved that the defendant used or disclosed the trade secret after having actual knowledge or reason to know that the information was improperly obtained.')." (*ClearOne, supra*, 2007 WL 4376125 at p. *2, fn. 3, italics & boldface omitted.)

The quoted treatise passage, however, does not address the element of "knowledge of the trade secret" but a distinct form of scienter *additionally* required for some forms of misappropriation. Although the court appears to have cited an edition of the treatise which has now been superseded, the quoted passage almost certainly originates in an article still set forth there at length. (See 3 Jager, Trade Secrets Law, appen. A2, § A.2:5, p. App. A2-35, quoting Pooley, *The Uniform Trade Secrets Act: California Civil Code § 3426* (1985) 1 Santa Clara Computer & High Tech. L.J. 193, 201.) The sentence quoted in *ClearOne* appears in the context of the author's enumeration of the *different types of misappropriation* that may be predicated on "use" or "disclosure." The quoted language does not concern the defendant's knowledge *of the trade secret* but his cognizance of the means by which it was

obtained.[10] The statute specifies required mental states with respect to both the trade secret *and* the means by which it became available to the defendant. To equate one of these requirements with the other offends basic principles of statutory construction.

Having thus unmoored itself from the text of the statute, the court in *ClearOne* found a claim adequately stated by allegations that the software used by the defendant " 'constitutes and includes the ClearOne trade secrets,' " and that the defendant "knew—or should have known—of [the] improper means" by which the unfaithful employees' and their company, WideBand, had created the product sold to the defendant. (*ClearOne, supra*, 2007 WL 4376125 at p. *2.) "Because ClearOne has alleged that . . . Biamp knew that WideBand derived the WideBand Code through improper means, the court need not consider whether Biamp actually understood the object code." (*Id.* at p. *3.)

We find this reasoning unacceptable. Nor do we find support for the court's conclusion—or Silvaco's argument here—in *Data General Corp. v. Grumman Systems Support Corp.* (D.Mass. 1993) 825 F.Supp. 340, 359 (quoted in *ClearOne, supra*, 2007 WL 4376125 at p. *3), where the court wrote, "An infringer may be liable for misappropriating trade secrets when it loads and runs a computer program in its object code form, even if the infringer never understands exactly how the program works."[11] But that decision was applying the law of a state that had not adopted the uniform act. (Cf. Mass. Gen. Laws ch. 93, § 42.) Moreover the court's reasoning reflects a certain vagueness, not to say incoherence, about what constituted the trade secret at issue there. It acknowledged that those who acquire only a program's object code—as the defendant there apparently had—are "unable to discover its trade secrets" because object code "is essentially unintelligible to humans." (*Data General Corp. v. Grumman Systems Support Corp., supra*, 825 F.Supp. 340, 359 (quoted in *ClearOne, supra*, 2007 WL 4376125 at p. *3).) It made no attempt to explain how, despite this fact, use of the object code could

---

[10] The entire paragraph reads, "The third category goes beyond the person who engaged in the improper acquisition, and applies to disclosure or use by one who knew or should have known that the secret was acquired by improper means. Liability is imposed under this subsection without regard to the actor's *participation in acquisition* of the trade secret, but *attaches only in the event* that it can be proved that the defendant used or disclosed the trade secret after he had actual or constructive knowledge that the information was improperly obtained." (Pooley, *supra*, 1 Santa Clara Computer & High Tech. L.J. at p. 201, fn. omitted, italics added; see 3 Jager, Trade Secrets Law, *supra*, appen. A2, § A.2:5, p. App. A2-35.)

[11] To say that one who runs a computer program does not know "exactly" how it works is like saying that he does not know "exactly" how the central processor or the video chip or any other component of the computer works. The vast majority of users have virtually *no idea* of how any part of a computer works, but only how to make it perform particular functions. To the extent the mere use of a program *does* disclose "how it works," the program is in no sense "secret" and therefore fails the most basic test for protection under CUTSA.

constitute misappropriation of a trade secret. Conceivably the evidence there would have sustained a finding that the object code itself was a trade secret, a hypothesis that, if proffered in a jurisdiction following the uniform act, would raise difficult questions about the meaning of "information." But the court did not—at least explicitly—adopt any such hypothesis. Instead it appeared to refuse to distinguish between the source code and the object code, treating them as one unitary trade secret. No conceptual basis appears for this treatment unless it is the court's discussion of the plaintiff's copyright claims, in connection with which the court held that even though the plaintiff had only registered the source code, it could prove its claim "by showing infringement of either the source code or the object code version." (*Data General Corp.*, at p. 354.) Such a view may be sound under copyright law, which protects "works." (See *ibid.*; 17 U.S.C.A. §§ 101, 102.) But trade secret law protects "information." (§ 3426.1, subd. (d).) Assuming source code and the object code compiled from it may constitute a single "work" for purposes of copyright law—a point on which we express no opinion—they are not the same "information," any more than a pie is the same "information" as the recipe used to bake it.

For these reasons we find *ClearOne* unpersuasive, and we decline to follow it.[12] Liability under CUTSA is not dependent on the defendant's "comprehension" of the trade secret but does require "knowledge" of it. So far as the record shows, Intel did not know and had no way to get the information constituting the trade secret. It therefore could not, within the contemplation of the act, "use" that information.

Silvaco suggests that a more expansive reading of the knowledge requirement is necessary to effectuate the CUTSA's purpose of " 'maintenance of standards of commercial ethics.' " (14 West's U. Laws Ann. (2005) U. Trade Secrets Act, com. to § 1, p. 538, quoting *Kewanee Oil Co. v. Bicron Corp.* (1974) 416 U.S. 470, 481 [40 L.Ed.2d 315, 94 S.Ct. 1879].) But apart from

---

[12] In attempting to add weight to this decision Silvaco emphasizes that CUTSA must be applied so as "to effectuate its general purpose to make uniform the law with respect to the subject of this title among states enacting it." (§ 3426.8.) It is thus "appropriate," argues Silvaco, "to consider the law of other states in following the UTSA." But the cited policy can add weight to a decision only to the extent that the decision has some value as precedent to begin with. The unpublished federal district court decision on which Silvaco most heavily relies appears to lack precedential weight in the court—not to mention the state—where it was rendered. We do not mean to suggest that unpublished opinions may not have weight. Sound opinions are the heart of the common law tradition and deserve respect. Although Utah's state courts permit the citation of unpublished decisions (Utah Rules App. Proc., rule 30(f)), at least one Utah court has said that it is "generally not appropriate to cite unpublished cases as authority" (*Schultz v. State* (2006) 2006 UT App 105, ¶ 10, fn. 2 [132 P.3d 701, 703, fn. 2]). The rules governing federal district courts in Utah permit the citation of unpublished opinions, but declare them "not precedential" and limit them to their "persuasive value." (U.S. Dist. Ct., Local Civ. Rules, Dist. Utah, rule 7-2.) As noted, we do not find *ClearOne* persuasive.

the difficulties inherent in such an impressionistic approach to statutory construction, it is far from apparent that Intel's conduct here offended any sound or settled standard of commercial ethics. Intel initially purchased DynaSpice from CSI without, so far as this record shows, any inkling that CSI might have developed that product in a questionable manner. Thereafter, having presumably undertaken to develop its own products using DynaSpice, Intel learned of *claims* by Silvaco that CSI had misappropriated portions of its software design—claims which CSI denied. Only when CSI entered into a stipulated judgment requiring it to stop using Silvaco code could an outsider rationally conclude that there was substance to Silvaco's claims. But that very judgment authorized CSI to continue marketing and supporting its products provided they were modified to excise Silvaco's trade secrets. Further litigation ensued over the extent to which CSI had conformed to those restrictions, but that litigation appears to have concluded favorably to CSI.

To brand Intel's conduct as unethical, we would have to conclude that any end user of a software application must desist from its use—whatever the resulting harm to his own business—the moment anyone *claims* that the application was compiled from stolen source code. This would be a prescription for the stultification of technological development and of other business activities taking place at a considerable remove, causally and ethically, from the claimed wrong. Far from serving the purposes of trade secrets law, such a rule would make it far too easy to suppress competition and technological development by threatening not only would-be competitors, but also their customers, with litigation of virtually unlimited scope. So far as this record shows, nothing Intel did offended any proper sense of business ethics.[13]

In short, as applicable to this case the law conforms to the commonsense supposition that one cannot be said to have stolen something he never had. The weakness of Silvaco's attempts to establish otherwise is betrayed by its frequent and pervasive lapses into evasive sophistry. So far as appears from the record, Intel never *had* the trade secret whose theft is the subject matter of this action. That is the central defect in Silvaco's claim. Its arguments, devoted not to curing that defect but to distracting us from it, fail to suggest any error by the trial court in granting summary judgment.

D. *Judicial Estoppel*

Silvaco argues that the doctrine of judicial estoppel bars Intel from challenging the sufficiency of Silvaco's trade secrets claim. The doctrine of

---

[13] Nor is it easy to see why or how such a regime would be limited to software. Suppose a manufacturer hires a builder to design and construct a new manufacturing plant. Do business ethics demand that the owner shut down the plant upon learning that a competing builder alleges the plans were stolen from him? In other areas of law, concepts such as "bona fide purchaser for value" are deployed to constrain just such concatenations of liability.

judicial estoppel prevents a litigant from taking *two mutually incompatible positions* at different times where permitting him to do so would inflict prejudice on his adversary. The conditions for the doctrine's operation have been described as follows: "(1) the same party has taken two positions; (2) the positions were taken in judicial . . . proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183 [70 Cal.Rptr.2d 96].)

Nothing in this record satisfies the basic condition for the doctrine, which is that Intel has taken *two positions* that are *totally inconsistent* with each other. According to Silvaco, the first offending position was embodied in Intel's statements to the trial court in support of its demurrer to the non-CUTSA claims (see pts. II., III., *post*), when it characterized this matter as a " 'trade secrets case.' " By these statements, according to Silvaco, "Intel took the position that [the] *only* cause of action Silvaco could state based on the pleading allegations arose under the UTSA, which therefore preempted all Silvaco's claims stated under non-trade secret theories." (Original italics.) This is at best a tendentious restatement of Intel's position, which was that the non-CUTSA claims rested on an alleged misappropriation of trade secrets, and were therefore superseded by CUTSA.

Similarly, Silvaco inaccurately attributes to Intel a second, "diametrically opposed" position, namely, "that the allegations of Silvaco's complaint as a matter of law could not constitute misappropriation because Intel was [*sic*] allegedly did not gain comprehension of the trade secrets." Intel's actual position was that never having possessed the alleged trade secrets or had any knowledge of them, it could not be liable for their misappropriation. But even Silvaco's distorted rephrasing is insufficient to conjure up the required inconsistency. This requires the further spurious notion that by challenging the *sufficiency* of Silvaco's CUTSA claim, Intel was arguing that the act "cannot be applied" to this action. This notion, the argument concludes, is not compatible with the premise that CUTSA *supersedes* Silvaco's non-CUTSA causes of action.

It is tempting to parse the studied illogic of this argument in detail, but there is no necessity to do so. The simple fact is that Intel has taken one wholly consistent position throughout this litigation, i.e., Silvaco's claims sound in the misappropriation of trade secrets, and the evidence will not sustain its burden to establish the conditions of liability for such misappropriation. Intel's position on demurrer was that, because the action sounds in

trade secrets, any theory of liability not derived from CUTSA was superseded. As we discuss below, this position was entirely correct except for one claim, which was fatally defective in other respects. Intel's position on summary judgment was that Silvaco could not establish the conditions for liability under CUTSA. This position was wholly consistent with its position on demurrer and was, like it, entirely correct. We see no suggestion by Intel that CUTSA "cannot be applied." That premise, like much of Silvaco's case, is a straw man projected onto Intel's defense in the hope of obscuring its true shape. It furnishes no basis to suppose that the trial court erred in granting summary judgment.

## II. Supersession of Non-CUTSA Claims

### A. Superseding Effect of CUTSA

The trial court disposed of Silvaco's non-trade-secret counts on general demurrer. The basic question was whether the facts effectively pleaded in those counts would sustain a judgment in Silvaco's favor. This is a pure question of law, which we address without deference to the trial court's ruling.

Intel's main argument on demurrer is simply stated: (1) CUTSA, by its terms, preempts any other statutory or common law claim predicated on the theft of a trade secret, (2) each of Silvaco's non-CUTSA claims is predicated on the theft of a trade secret; (3) therefore none of the non-CUTSA counts states a separable cause of action. With the exception of the UCL claim—which, as discussed in the following part, does not appear to depend on the theft of a trade secret—this argument is sound.

In *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 962 [90 Cal.Rptr.3d 247], this court held that CUTSA "preempt[s] claims based on the same nucleus of facts as trade secret misappropriation."[14] Although the California version of the relevant provision is vexingly oblique, a legislative intent to supersede other grounds of civil liability does flow from statutory implication, context, legislative history, and general principles of statutory supersession.

---

[14] The Supreme Court has criticized the use of " 'preempt' " to describe the supersession of one state law by another. (*Zengen, Inc. v. Comerica Bank* (2007) 41 Cal.4th 239, 247, fn. 5 [59 Cal.Rptr.3d 240, 158 P.3d 800] (*Zengen*).) The court there adopted the term " 'displace.' " (*Ibid.*) For present purposes we favor "supersede," though each term has its advantages and disadvantages.

Section 3426.7 expressly addresses the effect of CUTSA on existing laws. Perplexingly, however, it does so only by declaring what the act does *not* "supersede" or "affect." (§ 3426.7, subds. (a), (b).) This language is all the more puzzling since part of it replaces language proposed by the National Conference of Commissioners on Uniform State Laws in the proposed Uniform Trade Secrets Act (UTSA), which would have affirmatively declared the Legislature's intent to "displace[] conflicting tort, restitutionary, and other law of this State" with respect to civil remedies. (14 West's U. Laws Ann., *supra*, U. Trade Secrets Act, § 7, subd. (a), p. 651.) The California Legislature replaced this affirmative supersessive declaration with a savings clause, which is then followed by a variant on the savings clause already present in UTSA.[15] (§ 3426.7, subds. (a), (b); cf. 14 West's U. Laws Ann., *supra*, U. Trade Secrets Act, § 7, subds. (a), (b), p. 651.) The result is that the California statute contains two savings clauses, but no explicit declaration of supersessive effect from which to "save" anything.

The chosen construction nonetheless implies an expectation that CUTSA would have a supersessive effect on existing laws; otherwise the savings clauses would have been superfluous. It therefore becomes significant that the savings clauses are limited in scope, i.e., they preserve the operation of statutes that "relat[e] to misappropriation of a trade secret" or "regulat[e] trade secrets" (§ 3426.7, subd. (a)), as well as existing "contractual remedies," "criminal remedies," and civil remedies "that are not based upon misappropriation of a trade secret" (*id.*, subd. (b)). If the Legislature had intended to keep existing civil remedies entirely intact, it could simply have left off the quoted qualification; indeed it need not have addressed these three categories separately, but could simply have said, "The remedies provided by this Act are supplementary to, and do not supersede, existing remedies."

That, however, was plainly not the intent. In the succeeding section the Legislature adopted verbatim the commissioners' declaration that the act should be "applied and construed to effectuate its general purpose to *make uniform the law* with respect to the subject of this title among states enacting it." (§ 3426.8; see 14 West's U. Laws Ann., *supra*, U. Trade Secrets Act, § 8, p. 656.) This purpose could not be served by merely making the act

---

[15] Section 3426.7 provides in part: "(a) Except as otherwise expressly provided, this title does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets. [¶] (b) This title does not affect (1) contractual remedies, whether or not based upon misappropriation of a trade secret, (2) other civil remedies that are not based upon misappropriation of a trade secret, or (3) criminal remedies, whether or not based upon misappropriation of a trade secret. [¶] (c) This title does not affect the disclosure of a record by a state or local agency under the California Public Records Act . . . ."

supplementary to the notoriously haphazard web of disparate laws governing trade secret liability. The central purpose of the act was precisely to displace that web with a relatively uniform and consistent set of rules defining—and thereby *limiting*—liability. That purpose would be grossly subverted by leaving alternative bases for liability intact.

Moreover the last quoted section, and the act as a whole, manifest a legislative intent to occupy the field of trade secret liability to the exclusion of other civil remedies. In this respect the situation resembles that in *Zengen, supra*, 41 Cal.4th 239, which addressed the supersessive effect of the California version of the Uniform Commercial Code. That was an action by a bank customer seeking reimbursement for certain funds transferred out of its accounts. The relevant provision of the California Uniform Commercial Code expressly *preserved* all applicable "principles of law and equity" except as they were "displaced by the particular provisions of this code." (Cal. U. Com. Code, § 1103.) It was undisputed that the case involved a funds transfer to which the act applied; the question was therefore whether the act applied "*to the exclusion* of other legal principles giving rise to other causes of action." (*Zengen, supra*, 41 Cal.4th at p. 251.) The court elsewhere stated the question as "whether the California Code has fully occupied the field of this litigation and displaced the non-California Code causes of action." (*Ibid.*) The answer was yes, because the act reflected a careful balancing of competing considerations with respect to transfers of the type at issue. Because all of the plaintiff's claims rested on that transfer, they fell squarely within the act's contemplation and were displaced by it.

Here, section 3426.7's peculiar construction—the provision of two savings clauses with no affirmative supersession clause—is best understood as *assuming* that CUTSA would occupy the field of trade secrets liability, and as seeking to limit the act's supersessive effect only as it might impair the specified statutes and remedies. This is consistent with legislative history suggesting that the purpose for the Legislature's divergence from the uniform act was not to eliminate the act's general supersession of alternative remedies but to protect the large number of statutes *expressly dealing* with trade secrets in particular settings. The California language first appeared not in the bill that was ultimately adopted, but in an unsuccessful predecessor bill introduced in the previous session. (Assem. Bill No. 3738 (1981–1982 Reg. Sess.) as introduced Mar. 25, 1982 (1982 Bill).) A report concerning that bill, from a committee chaired by its sponsor, described its effect on other statutes as follows: "Existing California statutory law contains *a number of scattered provisions affecting trade secrets*. For example, Penal Code Section 499c

provides for criminal penalties for misappropriation of trade secrets. This bill, which provides for civil remedies, is generally *not intended to affect any of the existing provisions*. It states that, except as otherwise expressly provided, it does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3738 (1981–1982 Reg. Sess.) as introduced Mar. 25, 1982, p. 2, italics added.)

Concern over the act's effect on particular existing laws was manifested in an amendment to the earlier bill specifying two statutes and one code division that it would *not* supersede.[16] The weakness in this approach, however—and the possible reason for its abandonment in the bill ultimately adopted—was that by identifying some statutes as *not* superseded, the act invited a construction that other, unmentioned statutes *were* superseded. (See *O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1443 [44 Cal.Rptr.3d 72] [under the maxim *expressio unius exclusio alterius est*, "the enumeration of things to which a statute applies is presumed to exclude things not mentioned"].) There were already many such statutes, and as the Legislature might readily foresee, many more would follow.[17] These statutes deal with a variety of narrow subjects; a common theme is to protect valuable private information that might otherwise become public through the exercise

---

[16] As ultimately amended, the earlier bill would have enacted a section 3426.7 specifying that it would not supersede then Government Code section 6254.7 (see now Gov. Code, § 6254.7, subd. (d)), which excepted trade secrets contained in certain environmental materials from being declared public records. (Assem. Bill No. 3738 (1981–1982 Reg. Sess.) as amended May 12, 1982, p. 4.) It would also have expressly preserved the equitable power of trial courts to overrule an assertion of trade secrets privilege under Evidence Code section 1060. (Assem. Bill No. 3738 (1981–1982 Reg. Sess.) as amended May 12, 1982, p. 4, citing Evid. Code, § 1060.) Finally it disclaimed any effect on "rights or remedies otherwise available under Division 5 . . . of the Labor Code . . ." (Assem. Bill No. 3738 (1981–1982 Reg. Sess.) as amended May 12, 1982, p. 4.), which includes one provision mandating the preservation of certain trade secrets (Lab. Code, § 6396) and another protecting information, gathered during workplace safety inspections, "which contains or which might reveal a trade secret referred to in Section 1905 of Title 18 of the United States Code" (Lab. Code, § 6322).

[17] In addition to the three provisions noted in the previous footnote, the codes contained at least nine other express references to trade secrets as of 1982, when the predecessor bill was under consideration. (See Bus. & Prof. Code, §§ 16606, 16607, subd. (a), 17508, subd. (c)(2); Ed. Code, former § 99156, see now Ed. Code, § 99162; Evid. Code, § 915, subd. (b); Food & Agr. Code, § 14022, subd. (d); Health & Saf. Code, §§ 25159.8, 25170, subd. (*l*), 25173.) Many additional such references may now be found. (See, e.g., Bus. & Prof. Code, §§ 511.4, subd. (b), 512, subd. (c), 4163.2, subd. (a)(3), 25000, subd. (b)(2); Code Civ. Proc., §§ 1297.93, subd. (b), 2025.420, subd. (b)(13), 2030.090, subd. (b)(6), 2031.060, subd. (b)(5), 2033.080, subd. (b)(4); Cal. U. Com. Code, § 9408, subd. (d)(5); Corp. Code, § 15903.04, subd. (g); Ed. Code, §§ 49701, art. IX, § G, subd. (3) [Interstate Compact on Educational Opportunity for Military Children], 69525, subd. (g)(2); Fish & G. Code, § 2089.9, subd. (a)(2); Food & Agr. Code, §§ 14022, subd. (d), 46029, subd. (c), 55075, subds. (a), (b), 71089, subd. (a), 78881, subd. (s), 78925; Gov. Code, §§ 6254, subd. (ad)(5)(A), 6254.15, 6254.26, subd. (b), 11126, subd. (c)(15), 11126.4, 22854.5, subd. (c), 37606, subds. (b), (c),

of some regulatory or other official power. The saving language of section 3426.7, subdivision (a), is readily understood as seeking to preserve the operation of these statutes, and thus to protect confidential, commercially valuable information from disclosure by or through government action—not to preserve preexisting civil remedies for misappropriation of trade secrets.

We thus reaffirm that CUTSA provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies "based upon misappropriation of a trade secret." (§ 3426.7, subds. (a), (b).) The question then is whether Silvaco's claims fall within this description. It appears that with one exception (see pt. III.A., *post*), all of them do. The conversion cause of action, last pleaded in Silvaco's second ("first amended") complaint, was predicated on "the conversion and use of SILVACO's property as described herein."[18] Likewise the claim entitled "Common Count" is predicated on Intel's having "obtained certain property . . . as alleged herein." The count for common law unfair business practices was predicated on "Intel's conduct" as previously described in the pleading—i.e., its use of CSI software containing Silvaco trade secrets. In its last iteration of the claim for intentional and negligent misrepresentation, in the fifth complaint, Silvaco alleged in essence that Intel lied about its continuing use of CSI code, which use—according to Silvaco—constituted a misappropriation of trade secrets.

These claims are either "based upon misappropriation of a trade secret" (§ 3426.7, subd. (b)(2)) or they are based upon no legally significant events at all. No interest in "property" was identified other than one arising under trade secrets law, because the only property described in the complaint is "the stolen property that belongs to SILVACO" that was "contained" in "the CSI Software" used by Intel, and the only property interest that Silvaco could have in that software under the facts alleged in the pleadings is a trade secret. Nor was any "conduct" identified that did not depend for its supposed wrongfulness on the use of trade secrets. Without the claimed theft of a trade secret, the complaint would set forth no foundation for any of these claims. Since none of them sounds in contract, they are all superseded by CUTSA, and none of them states a cause of action independent of that act.

---

37606.1, 54954.5, subd. (h), 54956.87; Health & Saf. Code, §§ 1367.10, subd. (b)(1), 1395.5, subd. (c), 1462, subds. (b), (c), 11100, subd. (c)(1)(A), 11106, subd. (b)(2), 25160.2, 25358.2, 110165, 110370.)

[18] Among the many obstacles Silvaco has erected to navigation of the record is its failure to number the four successive complaints filed after its "first amended complaint." Each succeeding complaint was entitled simply "verified amended complaint." We have adopted Intel's practice of referring to them in numbered sequence, such that the original complaint is the "first complaint," the first amended complaint is the "second complaint," and so on.

B. *Silvaco's Counterargument*

Silvaco contends that Intel's supersession argument is procedurally barred by Intel's challenge to the *CUTSA* cause of action. This argument takes several forms, none of which is easily reduced to syllogistic terms. The first seems to rest on the premise, echoed in the judicial estoppel argument rejected above, that by asserting the substantive insufficiency of the CUTSA cause of action, Intel necessarily implied that CUTSA does not "apply" to the case. If CUTSA does not "apply," proceeds the argument, it cannot supersede other theories of relief.[19] By this logic, no cause of action can ever be barred by statutory supersession unless the plaintiff has a viable claim under the superseding statute. This of course is not so. A statute may supersede other causes of action even though it does not itself provide relief on a particular set of facts.

The scope and operation of a statute, including any bar it may erect to other theories of liability, is derived from its terms and intent as determined under principles of statutory construction—not from a priori sophistry of the kind proffered by Silvaco.[20] As we have already noted, the avowed purpose of CUTSA is to formulate a consistent set of rules to govern and define liability for conduct falling within its terms. (§ 3426.8.) That these rules do not permit recovery in a particular case hardly means that the statute ceases to "apply." Similarly the workers' compensation act declares itself the "exclusive remedy" against employers and coworkers for work-related injuries whenever the "conditions of compensation" are present. (Lab. Code, §§ 3602, subd. (a), 3601, subd. (a).) This effect is not limited to cases where the employee actually recovers workers' compensation. If the prescribed conditions are present, but no remedy is available, then the logical effect of the exclusive remedy provision is to deny any relief. Or to take another example, surely no one—even Silvaco—would suggest that a plaintiff whose trade secret claim is found to be barred by CUTSA's statute of limitations (§ 3426.6) is thereby freed to sue under another law.

---

[19] Thus counsel writes, "By definition, the UTSA preempts other claims *only* when the UTSA applies. *See* Civ. Code § 3426.7. [¶] Intel argued . . . that Silvaco's allegations as a matter of law cannot state a cause of action under the UTSA because Intel's use of the executable software (which embodies and uses the Silvaco Trade Secrets) does not constitute a cognizable claim. Assuming *arguendo* this theory were correct, the UTSA by definition is inapplicable and, therefore, cannot preempt non-UTSA claims."

[20] Thus, in an attempt to lay a foundation for a related argument, Silvaco suggests that the issue originated with *Intel*, writing, "Intel's argument essentially was that 'Silvaco cannot plead in the alternative.' [11 App.Tab. 81 at 3290:19–21.]" It is difficult to understand the purpose of the quotation marks if not to convey the impression that the quoted words are Intel's. They are not. Silvaco is quoting *its own* attempt, in opposition to a demurrer, to saddle Intel with this same straw man.

CUTSA's supersession clause applies to claims "based upon misappropriation of a trade secret." (§ 3426.7, subd. (b).) All of Silvaco's claims, except its UCL claim (see pt. III., *post*), depend on Intel's supposed use, in Silvaco's words, of "software . . . which embodies and uses . . . Silvaco Trade Secrets." Its exclusive remedy therefore lies in CUTSA. If it cannot establish liability under CUTSA, it is not entitled to relief. This conclusion offends neither logic nor principle.

■■■ Silvaco also asserts that the finding of supersession violated its right to "plead alternative legal theories." It correctly observes that California law permits a party to plead factually and legally inconsistent theories in separate counts. (See 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 402, p. 542.) But the right to plead *inconsistent* theories is not a right to plead facially *deficient* theories. A plaintiff cannot avoid dismissal of one deficient claim by wedding it to another deficient claim—or for that matter, to a sufficient claim.

■■■ This fact seems to mark a divergence between the law of this state and the pleading rules applied in federal cases, cited by Silvaco, where the dismissal of common law claims on grounds of UTSA supersession was deemed "premature." In *Ali v. Fasteners for Retail, Inc.* (E.D.Cal. 2008) 544 F.Supp.2d 1064, 1072, the court concluded that it would be premature to dismiss a conversion claim, even though it was based upon the same facts as the plaintiff's CUTSA claim, because the court found it "still unclear how much of the allegedly misappropriated information was a trade secret." The court thus skirted the question of the *legal sufficiency* of the conversion claim insofar as the information in question was *not* a trade secret. The essence of conversion is "the wrongful exercise of dominion over the personal property of another." (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 119 [55 Cal.Rptr.3d 621] (*Fremont Indem. Co.*).) "The basic elements of the tort are (1) the plaintiff's ownership or right to possession of personal *property*; (2) the defendant's disposition of the *property* in a manner that is inconsistent with the plaintiff's *property rights*; and (3) resulting damages." (*Ibid.*, italics added.) In order to state a claim for conversion, the plaintiff must identify some *property* in which he had *property rights* with which the defendant could, and did, interfere. If the only arguable property identified in the complaint is a trade secret, and the only basis for any property right is trade secrets law, then a conversion claim predicated on the theft of that property is unquestionably "based upon misappropriation of a trade secret" (§ 3426.7, subd. (b)) and the conversion claim is preempted. The only thing that might change this conclusion is the plaintiff's assertion of *some other basis in fact or law* on which to predicate the requisite property

right. The time to do that is in the pleadings, not at trial. It is never "premature" to require that the plaintiff allege facts sufficient to constitute a viable cause of action.

The same doubtful reasoning attends the other two federal cases Silvaco cites. In *Cenveo v. Slater* (E.D.Pa., Feb. 12, 2007, No. 06-CV-2632) 2007 WL 527720, pages *3–*4 (*Cenveo*), the court wrote, "Preempting plaintiff's conversion claim at the [pleading] stage risks leaving the claimant . . . without a remedy for information he proves has been stolen." But "information" cannot be "stolen" unless it constitutes *property*. And information is not property unless some law makes it so.[21] If the plaintiff identifies no property right outside of trade secrets law, then he has no remedy outside that law, and there is nothing unsound or unjust about holding other theories superseded.[22]

Similarly, the court in *ClearOne, supra*, 2007 WL 4376125, declared it "premature" to dismiss the plaintiff's unjust enrichment claims because, as the plaintiff's attorney said, that claim would be barred by UTSA only " 'if in fact it is determined that we have a trade secret, and if in fact that is the basis for the unjust enrichment claim.' " (2007 WL 4376125 at p. *4.) But the courts of this state will not hear a party defend a pleading by speculating about what *may* emerge as its "basis." Under the law of this state, the sufficiency of a pleading depends on what *is* stated in it. If the pleader has alleged facts that expose a fatal defect in his claim or defense—such as CUTSA supersession—then he can avoid that defense only by pleading other

[21] Indeed, conversion traditionally required a taking of *tangible* property, and thus was not available to remedy the misappropriation of something like a trade secret. (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 702, p. 1025; *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1565 [54 Cal.Rptr.2d 468].) This restriction has been greatly eroded. (See *Fremont Indem. Co., supra*, 148 Cal.App.4th 97, 120–123, 125–126 [subsidiary could state cause of action against parent for converting net operating losses of subsidiary's predecessor], citing *Payne v. Elliot* (1880) 54 Cal. 339, 342 [refusing to condition liability for conversion of stock upon taking of share certificates].) It has not, however, been destroyed. As the Second District observed in *Fremont Indem. Co., supra*, 148 Cal.App.4th at page 124, the expansion of conversion law to reach intangible property should not be permitted to "displace other, more suitable law."

[22] We emphatically reject the *Cenveo* court's suggestion that the uniform act was not intended to preempt "common law conversion claims based on the taking of information that, though not a trade secret, was nonetheless of value to the claimant." (*Cenveo, supra*, 2007 WL 527720 at p. *4.) On the contrary, a prime purpose of the law was to sweep away the adopting states' bewildering web of rules and rationales and replace it with a uniform set of principles for determining when one is—and is not— liable for acquiring, disclosing, or using "information . . . of value." (See § 3426.8.) Central to the effort was the act's definition of a trade secret. (See § 3426.1, subd. (d).) Information that does not fit this definition, and is not otherwise made property by some provision of positive law, belongs to no one, and cannot be converted or stolen. By permitting the conversion claim to proceed on a contrary rationale, the *Cenveo* court impliedly *created* a new category of intellectual property far beyond the contemplation of the act, subsuming its definition of "trade secret" and effectively obliterating the uniform system it seeks to generate.

facts in the alternative that avoid that effect *while stating a cause of action.* Where the plaintiff alleges the conversion of a trade secret, a California court will not overrule a demurrer on the rationale that unknown facts may yet emerge that would establish some property right not dependent on the law of trade secrets. An allegation that a person has converted an idea or information simply does not state a cause of action without the allegation of further facts showing a property right in the idea or information allegedly converted.

Silvaco has skirted this central weakness in its "alternative" claims throughout the history of this and related lawsuits. In a typical circumlocution, counsel writes that Silvaco's claims for conversion, unjust enrichment ("common count"), and unfair business practices "were neither predicated nor dependent upon a finding that *the Silvaco property acquired and used by Intel* constituted trade secrets or that their acquisition and use constituted a 'misappropriation' under the UTSA." (Italics added.) But no attempt is made to identify any "Silvaco property" other than the trade secrets supposedly used to create DynaSpice. The non-CUTSA claims therefore do not genuinely allege "alternative legal theories" but are a transparent attempt to evade the strictures of CUTSA by restating a trade secrets claim as something else.

The right to plead alternative theories exists to protect against unfairness to a pleader who is *justifiably uncertain* about the facts giving rise to an injury or the legal principles that may govern those facts. It does not exist to permit meritless claims to proceed to trial merely by combining many of them together. The rules cited by Silvaco concerning the time of election, i.e., when the plaintiff must choose between inconsistent theories, are wholly beside the point. A meritless claim may be dismissed whenever its lack of merit is demonstrated in accordance with applicable rules of procedure. Here it was clear on the face of the complaint that all but one of the non-CUTSA claims depended on the misappropriation of a trade secret, and were therefore superseded. The order dismissing them did not implicate rules governing pleading in the alternative.

III. *Unfair Competition*

A. *Applicability of Supersession to UCL Claims Generally*

As originally pled, Silvaco's claim for unfair business practices fell squarely within the foregoing analysis. Silvaco alleged that "Defendants, and each of them, engaged in unfair and unlawful business practices in violation of . . . Sections 17200 et seq. of the California Business and Professions Code

including, but not limited to the misappropriation and use of SILVACO trade secrets." The count thus sounded in misappropriation of trade secrets and stated no basis for relief outside of CUTSA.

It might be suggested—though Silvaco has not cogently suggested it—that insofar as the UCL might be construed to afford a remedy for trade secret theft, it is a "statute relating to misappropriation of a trade secret, or . . . otherwise regulating trade secrets" and is thus expressly exempted from CUTSA's superseding effect under section 3426.7, subdivision (a). As we have noted, however, the evident intent of the quoted language was not to preserve liability under every statute that *might be applied* to trade secret theft, but only to preserve the operation of the many statutes that *expressly allude* to trade secrets in particular settings. Again the avowed purpose of CUTSA is "to make uniform the law with respect to the subject of this title among states enacting it." (§ 3426.8.) This purpose would hardly be served by preserving whatever local remedies might be recognized under a general statute like the UCL. No basis appears to attribute such an intention to the Legislature. It follows that CUTSA bars UCL claims sounding in misappropriation of trade secrets.

### B. *Gist of UCL Claim As Amended*

Although Silvaco's original UCL claim depended on the misappropriation of a trade secret, and was thus superseded by CUTSA, that claim as ultimately amended no longer sounds in misappropriation of trade secrets. Rather, as framed in the sixth complaint, the claim asserts "wrongful conduct . . . *other than* the acts that constitute misappropriation of the Silvaco Trade Secrets . . . including . . . *aiding and abetting . . . CSI's violation of the Judgment* and the receipt of maintenance, consulting and support from CSI in violation of CSI's obligations under the Judgment." Most of this language appears to be surplusage, but the portion we have italicized suggests that the gravamen of the claim is Intel's actionable participation in CSI's violation of the judgment against it. There is ample reason to question whether the complaint effectively pleads the facts prerequisite to liability on this theory. (See *Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144–1146 [26 Cal.Rptr.3d 401]; *Richard B. LeVine, Inc. v. Higashi* (2005) 131 Cal.App.4th 566, 574 [32 Cal.Rptr.3d 244]; *Schulz v. Neovi Data Corp.* (2007) 152 Cal.App.4th 86, 88–90 [60 Cal.Rptr.3d 810].) However Intel does not challenge the complaint on that theory. Rather it contends that such a claim, even if adequately pleaded, would be superseded by CUTSA.

We cannot accept this view. Such a claim does not depend on the existence of a trade secret, but on knowingly facilitating another in the violation of its obligations under a judicial decree. If one is enjoined from disclosing

information, and one discloses that information in violation of the injunction, the legal consequences of that act are not affected by the status of the information as a trade secret. Indeed it may not, and need not, *be* a trade secret. The injunction might be entered in the preliminary stages of an action, and the wrong would be complete when the judgment was violated, even if it were ultimately found that the information was *not* a trade secret. In such a case, of course, the aider-abettor might raise a substantial question about *damages*, but his *liability* for facilitating the enjoined party's contempt would not depend on the correct legal characterization of the information whose contemptuous disclosure he facilitated. Indeed the injunction might rest on some rationale entirely apart from trade secrets law, such as that the plaintiff is under an independent duty of nondisclosure, and the consequences of disclosure—and of facilitating disclosure—would be the same. In the present matter, it appears that the injunction was the product of a stipulation, so the question of trade secrets was apparently never adjudicated. This fact has no effect on the gist of the claim, which is that Intel helped CSI to violate the latter's solemn obligations under a judgment. Such a claim appears to fall well outside the reach of CUTSA supersession.

The trial court ruled that "to the extent" this claim was "based on the same operative facts as Silvaco's misappropriation claim," it remained subject to CUTSA supersession. This statement is true in the abstract, but sidesteps the pivotal concrete question of what are the "operative facts" for purposes of the cause of action. As concluded above, the UCL claim as amended—whatever its other legal merits—appears to be free of any dependency on trade secrets law. It rests instead on the premise that Intel helped CSI to violate an injunction and thus to commit a contempt of court. Such a claim is not superseded by CUTSA.

## C. Lack of Standing

The trial court also appeared to adopt Intel's second argument on demurrer, which was that Silvaco's prior unsuccessful attempt to establish *CSI's* violation of the judgment barred Silvaco from proving that *Intel had helped* CSI to violate the judgment. We have serious doubts whether the record before the court was sufficiently specific to support that conclusion, in that we see no indication of what precise claims and issues were decided in the earlier matter. We need not reach the issue, however, if the judgment is correct on another ground.

On appeal the central inquiry is always whether the trial court took the correct *action*, not whether its reasons were sound. If the action was correct, the effect on the appellant is not altered by unsound reasoning on the part of the court. Therefore, "[i]f the decision of the lower court is right,

the judgment or order will be affirmed regardless of the correctness of the grounds on which the court reached its conclusion." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 346, p. 397.)

■ In addition to the arguments already mentioned, Intel argued below, and argues on appeal that Silvaco has failed to plead the *type of injury* required for "standing" to maintain such a claim. Business and Professions Code section 17204 permits a private person to maintain an action under the UCL only when he "has suffered injury in fact and has lost money or property as a result of the unfair competition." Voters imposed this limitation in 2004 by adopting Proposition 64, the declared intent of which was "to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been injured in fact under the standing requirements of the United States Constitution." (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) text of Prop. 64, § 1, subd. (e), p. 109.)[23]

■ Federal standing requirements are satisfied by a showing that the plaintiff "has suffered 'an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." ' " (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 362 [87 Cal.Rptr.2d 654, 981 P.2d 499], quoting *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville* (1993) 508 U.S. 656, 663 [124 L.Ed.2d 586, 113 S.Ct. 2297].) This test seems met where, as here, the plaintiff alleges that the defendant's tortious or unlawful conduct has inflicted on him some concrete, legally cognizable harm, such as a loss of business opportunity. (E.g., *Havens Realty Corp. v. Coleman* (1982) 455 U.S. 363, 379 [71 L.Ed.2d 214, 102 S.Ct. 1114] [nonprofit organization alleged sufficient injury in fact, in that it was forced to divert resources from usual services to counteract defendant's discriminatory practices].) We may thus assume for our purposes that Silvaco satisfied the federal test by alleging that Intel helped CSI to violate the judgment prohibiting the latter from facilitating the further use of offending software.

Business and Professions Code, section 17204, however, goes further than the federal authorities by requiring that the plaintiff also have "lost money or

---

[23] We have previously questioned the uncritical importation of federal conceptions of "standing" into California jurisprudence. (*Jasmine Networks, Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, 989–993 [103 Cal.Rptr.3d 426].) As we then acknowledged, however, the UCL presents a unique circumstance in that, by virtue of Proposition 64, it expressly *incorporates* federal "standing" concepts and terminology. (180 Cal.App.4th at p. 992, fn. 5; see Voter Information Guide, Gen. Elec., *supra*, text of Prop. 64, § 1, subd. (e), p. 109.)

property."[24] Ordinarily when we say someone has "lost" money we mean that he has parted, deliberately or otherwise, with some identifiable sum formerly belonging to him or subject to his control; it has passed out of his hands by some means, such as being spent or mislaid, or ceded in a gamble, bad loan, or investment. Similarly, when we say someone has "lost" property we mean that he has parted with some particular item of property he formerly owned or possessed; it has ceased to belong to him, or at least has passed beyond his control or ability to retrieve it.

The requirement of "lost money or property" introduced into Business and Professions Code, section 17204 by Proposition 64 addresses a discrepancy that formerly existed between the notoriously broad *right to sue* conferred on would-be UCL plaintiffs, and the limited *remedial powers* available to the court in such an action. The latter were reflected in Business and Professions Code section 17203, which empowers the court to "make such orders or judgments . . . as may be necessary to *prevent the use or employment* . . . of any practice which constitutes unfair competition . . . or . . . to *restore to any person in interest any money or property, real or personal, which may have been acquired* by means of such unfair competition." (Italics added.) This provision was understood to authorize two forms of equitable relief— *preventive*, i.e., an injunction, and *restorative*, i.e., an order for restitution— but not to authorize *compensatory* relief, i.e., the kind of damages traditionally available only in an action at law. Thus a year before Proposition 64 was adopted, the Supreme Court wrote, "A UCL action is equitable in nature; damages cannot be recovered. [Citation.] . . . [Citation.] We have stated that under the UCL, '[p]revailing plaintiffs are generally limited to injunctive relief and restitution.' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144 [131 Cal.Rptr.2d 29, 63 P.3d 937], quoting *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 179 [83 Cal.Rptr.2d 548, 973 P.2d 527].) A few years earlier, the court had pointedly limited its use of the term "restitution" in this context to "orders compelling a UCL defendant to *return money obtained through an unfair business practice to those persons in interest from whom the property*

---

[24] Some tension undeniably exists between this narrower requirement and Proposition 64's declaration of intent, which refers only to the federal standard of "injur[y] in fact." (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 64, § 1, subd. (e), p. 109.) But voters were plainly told that the measure would impose a "lost money or property" test. The Attorney General's official summary told them that the measure would "allow[] private enforcement of unfair business competition laws only if [the plaintiff] was actually injured by, *and suffered financial/property loss because of*, an unfair business practice." (Voter Information Guide, Gen. Elec., *supra*, official title and summary of Prop. 64, p. 38, italics added.) Likewise, the Legislative Analyst wrote that the measure would prohibit any private person from maintaining a UCL action unless the person has "suffered injury and *lost money or property*." (Voter Information Guide, Gen. Elec., *supra*, analysis of Prop. 64 by Legis. Analyst, p. 38, italics added.)

*was taken*, that is, to persons who had an ownership interest in the property or those claiming through that person." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 126–127 [96 Cal.Rptr.2d 485, 999 P.2d 718], italics added, fn. omitted.) It was not lost on courts that while "[s]tanding to sue under the UCL [was] expansive . . . ," and the "scope of conduct covered by [it] [was] broad," it afforded only "limited" remedies. (*Korea Supply Co. v. Lockheed Martin Corp., supra*, 29 Cal.4th at pp. 1143, 1144.)

The 2004 amendment essentially stripped private plaintiffs of the power to maintain such a suit unless they could assert an entitlement to restitutionary relief in their own right. A private plaintiff unable to state a factual basis for personally recovering such relief can no longer maintain an action under the UCL.

 The approach now mandated by the UCL is illustrated by *Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 817 [66 Cal.Rptr.3d 543], where, after considering whether the plaintiff had shown injury in fact as contemplated by the federal cases, the court turned to "the other standing requirement, which obliges plaintiffs to show that they 'lost money or property as a result of . . . unfair competition.' (Bus. & Prof. Code, § 17204.)" The "import" of this language, the court reasoned, "is to limit standing to individuals who suffer losses of money or property that are *eligible for restitution*." (*Ibid.*, italics added.) Because restitution is an equitable remedy, and the circumstances equitably disqualified the plaintiff from obtaining it, she lacked standing to proceed under the UCL. (155 Cal.App.4th at pp. 818–819.)

Silvaco offers no basis to suppose that it has alleged or could allege facts entitling it to restitution. It points to no sum of money, belonging to it but acquired by Intel, that might provide the subject matter for such an order. Nor does it point to any Silvaco-owned *property* acquired by Intel, unless it is the trade secrets supposedly embodied in the CSI software—a theory that would raise the bar of CUTSA supersession. Silvaco has alleged no basis for either preventive or restitutionary relief. Therefore, the trial court properly sustained Intel's demurrer to the UCL cause of action. More broadly, the court properly concluded that Silvaco had failed to state facts sufficient to constitute a cause of action outside the confines of CUTSA. Since it was also unable to establish facts sufficient to sustain a claim under that act, the court properly entered judgment in favor of Intel.

## DISPOSITION

No error appears. The judgment is affirmed.

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied May 27, 2010, and the opinion was modified to read as printed above. Appellant's petition for review in the Supreme Court was denied August 18, 2010, S183336. Chin, J., and Corrigan, J., did not participate therein.