# United States Court of Appeals for the Federal Circuit

---

**RAYTHEON COMPANY,**
*Plaintiff-Appellant*

**v.**

**INDIGO SYSTEMS CORPORATION, FLIR SYSTEMS INCORPORATED,**
*Defendants-Cross-Appellants*

---

2016-1945, 2016-2050

---

Appeals from the United States District Court for the Eastern District of Texas in No. 4:07-cv-00109-RAS, Judge Richard A. Schell.

---

Decided: July 12, 2018

---

MICHAEL ROSS CUNNINGHAM, Cunningham Swaim, LLP, Dallas, TX, argued for plaintiff-appellant. Also represented by STEVEN DOMINIC SANFELIPPO, THOMAS C. WRIGHT.

JOSEPH R. PALMORE, Morrison & Foerster LLP, Washington, DC, argued for defendants-cross-appellants. Also represented by SETH W. LLOYD; MICHAEL JOSEPH COLLINS, ROBERT MILLIMET, Brewer, Attorneys & Counselors, Dallas, TX.

---

Before NEWMAN, DYK, and CHEN, *Circuit Judges.*

CHEN, *Circuit Judge.*

These consolidated appeals arise from a district court action filed by Raytheon Company (Raytheon) against Indigo Systems Corporation and FLIR Systems (FLIR) (collectively, Indigo) for trade secret misappropriation and patent infringement. The patent infringement claims were settled by the parties and dismissed. After a three-week trial, a jury found that Indigo did not misappropriate Raytheon's trade secrets relating to the production of infrared cameras. The district court then entered final judgment in favor of Indigo. Raytheon appeals from the district court's denial of its motion for judgment as a matter of law and motion for new trial regarding two of the alleged trade secrets. Indigo cross-appeals from the district court's decision denying its motion for attorney fees.

For the reasons that follow, we affirm the judgment of no liability in favor of Indigo. We also affirm the district court's denial of attorney fees.

### BACKGROUND

Raytheon is an industry leader in infrared technology and produces infrared imaging equipment. Indigo is a wholly-owned subsidiary of FLIR that also specializes in infrared imaging equipment. The technology at issue is embodied in infrared cameras, which enable people to see in the dark and through obstructions such as smoke. Inside the infrared camera are electronics to operate the camera and process digital data collected by an infrared detector, and a package to house the infrared detector.

The infrared detector is the "eye" of an infrared camera. There are two types of infrared detectors: cooled and uncooled. A cooled detector is housed within a "dewar," i.e., a detector package, which is integrated into a detector

dewar cooler assembly. An uncooled detector is housed within a vacuum detector package assembly. To operate properly, cooled detectors must be cooled to a subcryogenic temperature. In contrast, uncooled detectors operate at an atmospheric ambient temperature. Cooled detectors are both more expensive and more sensitive than uncooled detectors. Whether cooled or uncooled, infrared detectors must be maintained in a vacuum environment to work properly.

Indigo was founded in 1996 by four individuals, including three former Raytheon employees. In 2000, Indigo obtained an investment by Northrup Grumman to enter the infrared imaging market. By late 2000, Indigo was manufacturing and selling its own infrared cameras.

In 2007, Raytheon filed suit against Indigo in the Eastern District of Texas, alleging patent infringement as well as trade secret misappropriation under both California and Texas law. J.A. 122–33. For the trade secrets claims, Raytheon alleged that Indigo misappropriated Raytheon's trade secrets through hiring former Raytheon employees. J.A. 125.

The district court granted summary judgment to Indigo in 2009, finding that Raytheon's trade secrets claims were time-barred. J.A. 294–311. Indigo then moved for attorney fees under the Texas Theft Liability Act (TTLA). TEX. CIV. PRAC. & REM. CODE § 134.001–005; J.A. 312–94. The district court denied the motion on the ground that Indigo had not pleaded for attorney fees in its answer. J.A. 414–16. The parties then settled Raytheon's patent claims, and the district court entered final judgment, dismissing the patent claims with prejudice. J.A. 417, 11566.

The parties cross-appealed—Raytheon from the grant of summary judgment and Indigo from the denial of fees. This court reversed the district court's grant of summary judgment, reasoning that there were factual questions

regarding when Raytheon should have become aware of its misappropriation cause of action. *Raytheon Co. v. Indigo Sys. Corp.*, 688 F.3d 1311, 1318–19 (Fed. Cir. 2012). We also vacated the district court's order denying Indigo's motion for attorney fees. *Id.* at 1313 n.1. We noted, however, that the district court's reliance on the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to support its conclusion, was misplaced. *Raytheon*, 688 F.3d at 1313 n.1. After we remanded the case to the district court for further proceedings, *id.* at 1319, Raytheon amended its complaint, asserting its trade secret misappropriation claim only under California law and not Texas law, J.A. 432–49.

Trial began in 2014. Raytheon contended that Indigo had misappropriated 31 purported trade secrets belonging to Raytheon. J.A. 4–5. The jury ruled in Indigo's favor on all 31 alleged trade secrets.

Following the verdict, Raytheon renewed its motion for judgment as a matter of law, contending that it had conclusively established misappropriation of two specific trade secrets and that judgment should be entered in its favor, notwithstanding the jury's verdict. J.A. 881–909. The two trade secrets related to Raytheon's method and use of a specific sequential vacuum baking procedure (Trade Secret 14), and its process for *in situ* solder sealing package assemblies (Trade Secret 30). Although the jury found that both of these processes were trade secrets, it concluded that Indigo had not misappropriated either of them. J.A. 4–8, 10. Indigo filed its own renewed motion for judgment as a matter of law, contending that the evidence failed to demonstrate that alleged Trade Secrets 14 and 30 are truly trade secrets. J.A. 737–53. The district court denied both parties' motions. J.A. 20–23.

Indigo also filed an amended motion for attorney fees under the TTLA. J.A. 680–81. Indigo argued that it

qualified as a prevailing party under the TTLA because Raytheon had withdrawn its TTLA claim to avoid an unfavorable determination on the merits, *i.e.*, an adverse choice-of-law ruling that California law, rather than Texas law, governed Raytheon's misappropriation claims. J.A. 693–97. In denying Indigo's motion, the district court observed that Raytheon's continued pursuit of its misappropriation claims under California law established that Raytheon's withdrawal of its TTLA claim was not motivated by a desire to avoid an unfavorable ruling on the merits. J.A. 28.

STANDARDS OF REVIEW

This court reviews denials of motions for judgment as a matter of law and new trial under the law of the regional circuit where an appeal would otherwise lie. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1330 (Fed. Cir. 2010). Denials of motions for attorney fees under state law are reviewed under regional circuit standards applying state law. *See Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 424 F.3d 1235, 1238 (Fed. Cir. 2005); *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1365–66 (Fed. Cir. 2001). The regional circuit here is the Fifth Circuit.

The Fifth Circuit reviews a denial of a motion for judgment as a matter of law de novo. *See Janvey v. Romero*, 817 F.3d 184, 187 (5th Cir. 2016). Judgment as a matter of law is appropriate only where "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict." *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 973 (Fed. Cir. 2010) (applying Fifth Circuit law). The reviewing court must "draw all reasonable inferences and resolve all credibility determinations in the light most favorable" to the jury's verdict. *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1350–51 (Fed. Cir. 2010) (applying Fifth Circuit law). We affirm a district court's denial of judg-

ment as a matter of law when there was substantial evidence to support the jury's verdict. *Id.* at 1350.

The Fifth Circuit reviews a decision to grant or deny a motion for a new trial for abuse of discretion. *Foradori v. Harris*, 523 F.3d 477, 503–04 (5th Cir. 2008). The appellate court's "review of the denial of a new trial motion is more limited than when one is granted." *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998). Where a motion for a new trial is based on insufficiency of the evidence, a district court abuses its discretion in denying that motion only if the appellant makes a "clear showing" of "an absolute absence of evidence to support the jury's verdict." *Id.* Thus, in that context, the standard of review is actually "even more deferential than [the court of appeals'] review of the denial of a motion for judgment as a matter of law." *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1049 (5th Cir. 1998).

The standard of review in the Fifth Circuit for a district court's denial of attorney fees is abuse of discretion. *See Batton v. IRS*, 718 F.3d 522, 525 (5th Cir. 2013). The appellate court reviews de novo the legal question of a party's eligibility to recover attorney fees under a statute. *Id.*; *Texas v. Interstate Commerce Comm'n*, 935 F.2d 728, 730 (5th Cir. 1991).

DISCUSSION

The district court entered final judgment in favor of Indigo on March 31, 2016. Raytheon appealed on April 29, 2016, and Indigo timely cross-appealed on May 11, 2016. We have jurisdiction under 28 U.S.C. § 1295(a)(1) (2012). Although the patent claims that gave rise to jurisdiction under 28 U.S.C. § 1338 were settled and dismissed with prejudice, "the path of an appeal is determined by the basis of jurisdiction in the district court, and is not controlled by the substance of the issues that are appealed." *Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1034 (Fed. Cir. 2008) (internal quotation marks and

alterations omitted).  Where a patent claim is joined with a state-law claim in the complaint, we have jurisdiction over the entire appeal of the final judgment even where, as here, the patent claims have been dismissed with prejudice.  *See Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1190 (Fed. Cir. 2004) (holding that this court "retain[s] appellate jurisdiction over all pendent claims in the complaint" where the patent claims were dismissed with prejudice below).

The principal issues on appeal are: (1) whether the jury's verdict that Indigo did not misappropriate Raytheon's Trade Secrets 14 and 30 was supported by substantial evidence; (2) whether the district court abused its discretion in denying Raytheon's motion for a new trial; and (3) whether the district court abused its discretion in denying Indigo's motion for attorney fees under the TTLA.

## I. Trade Secret 14 Misappropriation Claim

The parties agree that California law governs Raytheon's trade secret misappropriation claim.  To prevail on its claim under the California Uniform Trade Secrets Act (CUTSA), Raytheon was required to prove, among other things: (1) it owned a trade secret; and (2) Indigo misappropriated the trade secret, either by acquisition, use, or disclosure.  *See Sargent Fletcher, Inc. v. Able Corp.*, 3 Cal. Rptr. 3d 279, 283 (Ct. App. 2003); *see also MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1114 (N.D. Cal. 2012).

Under California law, a trade secret must "(1) [d]erive[ ] independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [be] the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  CAL. CIV. CODE § 3426.1(d).  Thus, information that is generally known to the public cannot qualify as a trade secret; nor can it form the basis for a misappropria-

tion claim. *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (applying California law).

A defendant misappropriates a trade secret if it acquires, discloses, or uses a trade secret. "Misappropriation" is defined as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (A) Used improper means to acquire knowledge of the trade secret; or
>>
>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>>
>> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

CAL. CIV. CODE § 3426.1(b).

The CUTSA defines the term "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or

espionage through electronic or other means." *Id.* § 3426.1(a). Reverse engineering and independent derivation do not qualify as improper means. *Id.*

## A. Scope of Trade Secret 14

As an initial matter, the parties dispute on appeal the scope of Trade Secret 14 as it was presented to the jury.[1] Raytheon asserts that Trade Secret 14 is "its method and use of a sequential vacuum bake during the manufacturing process," consisting of "a sequence of cascading bakes, including a piece part bake, a subassembly bake, and then a final bake." Appellant Br. 25. For support, Raytheon relies on testimony from several witnesses, including its engineer, Stephen Black. J.A. 7690–91. Mr. Black explained that "the exact sequence of bakes is somewhat product dependent" and that the trade secret is "a sequence of cascading bakes." *Id.* at 7691.

Indigo responds that the concept of sequential vacuum baking had been well known and widely used to enhance vacuum life of a dewar. It asserts that the goal of outgassing (to remove gasses before sealing the dewar) had been commonly known and that companies have performed sequential (e.g., piece-part, subassembly, and then final) vacuum baking since at least 1996. J.A. 9727–29. Indigo also presented published articles disclosing sequential vacuum baking to enhance vacuum life. J.A. 9736, 11853–95. Thus, Indigo argues that the scope of Trade Secret 14 refers not to sequential baking in general, but Raytheon's specific baking recipes. It contends that the trade secret is limited to Raytheon's method of baking subassemblies of components and Raytheon's derivation

---

[1]    Neither party asked the district court to explicitly define the contours of the trade secrets before sending the misappropriation inquiry to the jury.

and selection of specific temperature ranges for specific materials and components.

The record does not reflect a clear definition of Trade Secret 14, but the undisputed evidence demonstrates that the trade secret is considerably narrower than Raytheon's proffered concept of a sequential vacuum bake. Such an asserted trade secret would cover information clearly in the public domain; Raytheon bore the burden of defining its trade secret with specificity. *Brescia v. Angelin*, 90 Cal. Rptr. 3d 842, 850–51 (Ct. App. 2009) ("[T]he burden on the trade secret claimant is to provide a level of detail adequate to distinguish the subject information from general knowledge or knowledge of skilled persons in the field."); *see MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 522 (9th Cir. 1993) ("[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist."); *Arco Indus. Corp. v. Chemcast Corp.*, 633 F.2d 435, 441–43 (6th Cir. 1980) (holding that plaintiff could not broaden a trade secret to cover plaintiff's "layout" or "approach" when plaintiff had claimed below that the detailed, individual steps of its process were the trade secret).

At trial, Raytheon's own witness, Mr. Black, acknowledged that vacuum baking of subassemblies at the highest temperature for the longest time had been reasonably well known, and that one would only "get into the trade secret" when it comes to identifying what temperature an individual part can withstand. J.A. 7373–74. Raytheon's counsel also explained that Raytheon was "talking specifics" in referring to its trade secret and "not talking about a general recipe." J.A. 6816.

According to Raytheon's own experts, the trade secret is "the use and details for vacuum baking pieces and subassemblies of dewars for enhanced vacuum performance and long product life" with "specific methods, timing, and temperature for optimization of the process."

J.A. 10390.  After having presented the jury with narrower definitions of its Trade Secret 14, i.e., by referring to Raytheon's specific sequential bake recipes, Raytheon cannot now try to broaden these definitions on appeal, particularly in view of the evidence that using a sequence of vacuum bakes was a previously-known concept.

## B. The Jury Reasonably Found that Indigo did not Misappropriate Trade Secret 14

Raytheon's theory of misappropriation is that: (1) Andrew Sharpe, a former Raytheon employee who left to work at Indigo, shared Raytheon's sequential vacuum bake recipes with Indigo; that (2) Indigo then used those recipes to develop its own recipes; and that (3) Indigo disclosed Raytheon's recipes to FLIR after the 2004 acquisition by FLIR.  Because substantial evidence supports the jury's conclusion that Indigo did not misappropriate Trade Secret 14, Raytheon has not established that it was entitled to judgment as a matter of law.

During trial, Mr. Sharpe expressly denied taking Raytheon's specific recipes from Raytheon or otherwise misappropriating them.  J.A. 6925–27, 6998.  If, as Mr. Sharpe testified, Indigo did not acquire the trade secret, it necessarily could not have used or disclosed it.  *See Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 45 (Ct. App. 2010) (defendants cannot have "used" plaintiff's trade secret unless defendants gained knowledge of the secret).

Evidence at trial also showed that Indigo employees (Sharpe and Matson) independently developed Indigo's particularized sequential vacuum baking recipes without using Raytheon's.  J.A. 9001–03, 9064–67.  Mr. Sharpe testified to learning about vacuum technology during his time at Electropacific Inc. (where he worked before joining Raytheon).  J.A. 6916.  Mr. Sharpe's process development notes showed that he simply adhered to the well-known practice of baking different parts of the assembly at the

highest possible temperature for the longest possible period of time. J.A. 11230. He also developed Indigo's own recipes through experimentation and in consultation with vendors of materials. J.A. 6992, 11230.

Further, the recipes of Indigo are significantly different from those of Raytheon. As Mr. Sharpe testified, Raytheon and Indigo do not use the same sequence vacuum bake recipes. J.A. 6992. Indigo's technical expert testified about the substantial differences. J.A. 9730. For example, Indigo's recipes, having eleven methods as compared to Raytheon's four, are "far more specific," and the recipes differ in time, temperature, and pressure. *Id.* The expert also stated that Indigo uses pressure in its recipes that is "on an order of magnitude" higher than that used by Raytheon. *Id.* Accordingly, the district court properly denied Raytheon's JMOL motion because a reasonable juror could have found that Raytheon's trade secret (a set of specific bake recipes) was never disclosed to or used by Indigo.

Raytheon argues that Indigo must have misappropriated its trade secret because Indigo placed Mr. Sharpe in a position to do the same kind of work he had done at Raytheon (i.e., cooled packaging process) and did so after initially telling Mr. Sharpe he would work in a different area (i.e., uncooled packaging process). But this does not provide the full picture or draw all reasonable inferences in Indigo's favor. Mr. Sharpe was hired to set up Indigo's vacuum packaging facility. J.A. 6850. As he explained, a vacuum packaging facility is "independent of the type of product"—it can be used for either cooled or uncooled products. *Id.* Further, Mr. Sharpe's assignment to set up the manufacturing line came only after the founders concluded that the concept of vacuum baking to enhance vacuum life was in the public domain. J.A. 7783–84. Mr. Sharpe also took precautionary measures by removing himself from the design process for cooled products and by limiting himself to the setup of the manufacturing facility

for those products.  J.A. 6985.  Thus, a reasonable jury could believe Mr. Sharpe's work assignment did not show that he had shared Raytheon's trade secrets or that Indigo desired that he do so.

To establish that Indigo's bake recipes originated at Raytheon and that Mr. Sharpe was Indigo's source for such information, Raytheon contends that Mr. Sharpe admitted learning everything he knew about the sequential vacuum bake process *from* Raytheon.  But Mr. Sharpe's testimony does not support such a contention.  Rather, he simply acknowledged that he learned about infrared technology at Raytheon.  J.A. 6766.  But this does not contradict his other testimony explaining that he developed Raytheon recipes through public domain materials, consultation with vendors, and experimentation, or that he later developed Indigo's recipes using similar, non-proprietary methods.

For these reasons, the jury reasonably found that Indigo did not misappropriate Trade Secret 14, and the district court did not err in denying Raytheon's motion for judgment as a matter of law regarding this claim.

## II. Trade Secret 30 Misappropriation Claim

As with Trade Secret 14, Raytheon on appeal seeks to broaden the scope of subject matter protected by Trade Secret 30 and then to base its arguments for misappropriation on that broadened definition.  But this expanded conception is contrary to how Raytheon framed its trade secret before the jury.

### A. Scope of Trade Secret 30

On appeal, Raytheon claims that Trade Secret 30 is directed to its *in situ* solder seal package assembly process, consisting of "the use of a batch process to allow for the manufacture of multiple bolometer packages simultaneously in a vacuum chamber."  Appellant Br. 37; J.A. 7312–13, 7710.  "In Raytheon's trade secret process,

instead of solder sealing each individual detector package, a batch of detector packages can be solder sealed in a single vacuum chamber at the same time." Appellant Br. 37; J.A. 7710.

Indigo responds that Trade Secret 30 is more specific and detailed. According to Indigo, the claimed trade secret refers to Raytheon's own process of solder sealing batches of uncooled ceramic packages, and consists of the time and temperature of each step in that process, as well as the choice of metals and choice of solders used for sealing the package. J.A. 7715.

As with Trade Secret 14, the record regarding the scope of Trade Secret 30 is less than clear. But the undisputed evidence establishes that Raytheon was claiming its own specific process for solder sealing package assemblies *in situ* as a trade secret, rather than something more generic. Raytheon's witness, Mr. Black, referred to the trade secret as encompassing the particular time and temperature of each step in the process, as well as the choice of metals and solders. J.A. 7715. He also described Raytheon's evaluation of solder seals and metallurgy as being part of the *in situ* process. J.A. 7314. This is consistent with what Raytheon argued in its post-trial briefs: "to use the *in situ* process recipe, one would need to know a variety of things, including choice of metals, choice of solders, and times and temperatures[.]" J.A. 5467. As stated in Raytheon's expert report, "Raytheon's trade secret is the method developed to reliably prepare and perform an *in situ* tubeless closure on uncooled ceramic packages. This method was developed to provide reliable solder joints with the type of flux-less solder used combined with the correct time and temperature at the correct vacuum levels." J.A. 10426. Viewed collectively, Raytheon's own evidence indicates that Trade Secret 30 is not just the manufacture of multiple bolometers simultaneously in a vacuum chamber; it also includes the time

and temperature of each step of that manufacturing process, as well as choice of metals and solders.

## B. The Jury Reasonably Found that Indigo did not Misappropriate Trade Secret 30

Raytheon's theory of misappropriation was that former Raytheon employee Carl Magoun shared Trade Secret 30 with Indigo and used that information to create Indigo's *in situ* process. Mr. Magoun was a former manager of Raytheon's mechanical engineering department. According to Mr. Magoun's resume, he had experience in the "design of vacuum processing and assembly system for *in situ* dewar build and final dewar closure." J.A. 7720–21.

Indigo's witnesses, however, explained that Indigo independently developed its *in situ* process. For example, Indigo presented evidence showing that Paul Schweikert, an Indigo employee who never worked at Raytheon, independently developed Indigo's *in situ* solder seal package assembly process used to package the uncooled infrared detectors for use in automobiles. J.A.8959–69. Multiple witnesses testified that Mr. Schweikert was responsible for developing Indigo's *in situ* solder seal package assembly process. J.A. 6996–97, 8959–60, 9020.

Mr. Schweikert testified that in 2002 and 2003 he engaged in substantial brainstorming and experimentation to develop Indigo's *in situ* process. J.A. 8960–66. He documented his development efforts extensively. J.A. 8961–64. He also described his experiments in detail to the jury, including how he chose the solder to be used in the process and how he arranged to activate a "getter" (i.e., a molecular sponge used to soak up gas inside the detector package) after finally sealing the package. J.A. 8964–65, 8967–68. When Indigo later obtained a patent for its *in situ* process, Mr. Schweikert was listed as the lead inventor. J.A. 8976, 11914–31. Notably, Mr. Magoun was not a named inventor on the patent.

Further, despite basing its misappropriation theory for Trade Secret 30 around Mr. Magoun, Raytheon never called him as a witness; and, no witness testified that Mr. Magoun shared Raytheon's Trade Secret 30 with anyone at Indigo. The trial testimony showed instead that, although Mr. Magoun was a project leader, his role was principally supervisory. J.A. 9013, 9072–73. Further, Mr. Schweikert testified that Mr. Magoun did not develop Indigo's *in situ* solder sealing process. *Id.* Rather, Mr. Magoun had proposed that Indigo buy an off-the-shelf *in situ* machine rather develop one internally. J.A. 9020. That proposal was rejected and Mr. Schweikert instead developed Indigo's process and machine in-house. J.A. 9020, 9749.

Drawing all reasonable inferences from the evidence in favor of the verdict, the jury had more than a sufficient basis to conclude that Raytheon had not proven misappropriation of Trade Secret 30. Because Raytheon did not present any direct evidence that Indigo ever acquired Trade Secret 30 and because Indigo presented substantial evidence that it independently developed its *in situ* process, we agree with the district court that the jury reasonably concluded that Indigo did not acquire, use, or disclose Trade Secret 30.

### III. Raytheon's Motion for a New Trial

As an alternative to its request for judgment as a matter of law, Raytheon moved for a new trial, but the district court denied this motion. J.A. 23. The denial of a motion for new trial is reviewed for a clear abuse of discretion, and will not be reversed unless there is a complete absence of evidence to support the jury's verdict. *Rivera v. Union Pac. R.R.*, 378 F.3d 502, 506 (5th Cir. 2004).

Based on the above and our careful review of the entire record in this case, we see no basis to set aside the jury's verdict for a new trial. A review of the district

court's denial of Raytheon's new trial motion is "even more deferential than [a] review of the denial of a motion for judgment as a matter of law." *Hidden Oaks*, 138 F.3d at 1049. Raytheon's failure to establish its entitlement to judgment as a matter of law on the trade secret misappropriation issue also means it has failed to establish its entitlement to a new trial. Thus, the district court did not abuse its discretion in denying Raytheon's alternative motion for a new trial.

## IV. Attorney Fees under TTLA

In its cross-appeal, Indigo challenges the district court's denial of attorney fees. Specifically, Indigo argues that it was entitled to a mandatory award of attorney fees under the TTLA because it "prevailed" on Raytheon's claim under that statute, when Raytheon voluntarily withdrew its trade secrets claims based on Texas law and instead pursued that claim under California law. We disagree that Indigo is entitled to attorney fees for its defense of the TTLA claim and affirm the district court's order denying such fees.

We begin by examining the statutory language of the TTLA. The TTLA provides that "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees." TEX CIV. PRAC. & REM. CODE § 134.005 (b). Although the TTLA does not expressly define "prevails," Texas courts have held that the phrase "prevailing party" in the TTLA includes both a plaintiff successfully prosecuting a trade secret theft suit and a defendant successfully defending against one. *See, e.g.*, *Arrow Marble, LLC v. Estate of Killion*, 441 S.W.3d 702, 706 (Tex. Ct. App. 2014).

An award of attorney fees is mandatory when the statutory requirements under the TTLA are met. Texas courts have noted that such an award may be based on a court decision on the merits for either party. *See, e.g.*, *Moak v. Huff*, No. 04-11-00184-CV, 2012 WL 566140, at

*10 (Tex. Ct. App. Feb. 15, 2012). "To recover fees, the defendant must nevertheless prevail on the merits of the claim, which one court has interpreted to mean 'establish [defendant] did not commit theft.'" *Brinson Benefits, Inc. v. Hooper*, 501 S.W.3d 637, 642 (Tex. Ct. App. 2016) (citing *Travel Music of San Antonio, Inc. v. Douglas*, No. 04-00-00757-CV, 2002 WL 1058527, at *3 (Tex. Ct. App. May 29, 2002)).

A defendant may also claim prevailing-party status when the plaintiff nonsuits or dismisses the claim with prejudice. *Epps v. Fowler*, 351 S.W.3d 862, 868 (Tex. 2011). When a plaintiff's claims are dismissed with prejudice, the doctrine of res judicata prohibits the plaintiff from re-asserting his claims against that defendant in a later suit. *Id.* at 867. In certain circumstances, however, "a defendant may be a prevailing party when a plaintiff nonsuits without prejudice if the trial court determines, on the defendant's motion, that the nonsuit was taken to avoid an unfavorable ruling on the merits." *Id.* at 870.

Thus, to prove its entitlement to attorney fees under the TTLA here, Indigo must establish either: (1) it actually prevailed on the merits of a TTLA claim; (2) Raytheon dismissed the TTLA claim with prejudice; or (3) Raytheon dismissed the TTLA claim without prejudice to avoid an adverse ruling on the merits. The first two prongs do not apply because only the CUTSA claim went to trial and Raytheon dismissed the TTLA claim without prejudice. *See* J.A. 714. As a result, the relevant remaining question is: did Raytheon dismiss its TTLA claim to avoid an adverse ruling on the merits of that claim?

After having considered the statutory language and the relevant case law, we see no error with the district court's determination that the Indigo entities "are not the prevailing parties under the Plaintiff's TTLA claim and, therefore, are not entitled to attorneys' fees." J.A. 29.

Raytheon initially pleaded its trade secrets claims under two separate state laws. After additional discovery, it decided to pursue its trade secrets claims under the CUTSA rather than the TTLA. Dismissing the TTLA claim without prejudice in this context appears to represent a preference by Raytheon to pursue its trade secret misappropriation claims under one state's laws over another's. On this record, we agree with the district court that it is far from clear that Raytheon's focus on California law over Texas law was taken "to avoid an unfavorable ruling on the merits." *See* J.A. 28; *see also Epps*, 351 S.W.3d at 870.

Indigo argues that the district court erred because Raytheon withdrew its TTLA claim to avoid an unfavorable choice-of-law ruling, that such a ruling would have been on the merits, and that the withdrawal therefore gives rise to an attorney fees award under the TTLA.[2] To support its position, Indigo relies on two cases: *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140 (1988) and *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665 (5th Cir. 2003). Neither is a TTLA case.

In *Chick Kam Choo*, the Supreme Court held that a federal district court that had previously dismissed claims on *forum non conveniens* and choice-of-law grounds could enjoin the plaintiffs from reasserting their Texas state law claims in state court. 486 U.S. at 150–51. The Supreme Court explained that such an injunction would be proper under the relitigation exception to the Anti-Injunction Act because the validity of the Texas law claim was adjudicated in the original federal action when the district court decided that under applicable choice-of-law

---

[2] The record contains no evidence that, at the time Raytheon dismissed its TTLA claim without prejudice, there was a pending choice of law determination to be made by the district court.

principles, the law of Singapore, rather than Texas, controlled the petitioner's suit.  *Id.* at 150.

In *Vasquez*, the Fifth Circuit held that, after a federal district court dismissed plaintiffs' claims on *forum non conveniens* grounds, the plaintiffs could be properly enjoined from reasserting their Texas law claims in Texas state court pursuant to the same exception to the Anti-Injunction Act.  325 F.3d at 680.  The Fifth Circuit explained that the district court's earlier determination that Mexican law, rather than Texas law, applied, adjudicated the merits of plaintiff's Texas law claims.  *Id.*  In other words, when the federal court in the earlier action decided that Mexican law governed the suit, as part of the *forum non conveniens* analysis, it "actually adjudicated the Texas state law claims."  *Id.* ("Whereas the [*forum non conveniens*] dismissal did not decide the substantive merits of plaintiffs' claims, the court's choice of Mexican law did.  This is somewhat counter-intuitive, given that a choice-of-law determination is a necessary part of an [*forum non conveniens*] dismissal." (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 245 (1981))).

In our view, the cases upon which Indigo relies are inapposite.  First, unlike those cases, the district court here never made a ruling on the proper choice of law for Raytheon's trade secrets claims.  It is uncertain on this record how the court would have ruled on such a motion.  Second, unlike the plaintiffs in *Chick Kam Choo* and *Vasquez*, all of whom were barred from reasserting a state law claim in state court after receiving an adverse choice of law ruling in federal court, Raytheon is not attempting to reassert its trade secrets claims in a second state court action under the TTLA.  Further, all parties understood that Raytheon was going to pursue its trade secrets claims under either California or Texas law, and Indigo never explained why it would be an "unfavorable ruling on the merits" for Raytheon, even assuming a choice of law ruling was "on the merits," to litigate its claims under

California law.  For example, Indigo never suggested that Raytheon would somehow be in a better position to prove its trade secret misappropriation claims under Texas law as opposed to California law.  As for the possibility of receiving attorney fees under the TTLA, Indigo has not cited any decisions holding that a choice-of-law ruling is a ruling on the merits for purposes of awarding attorney fees under the TTLA.  Where, as here, significant uncertainty looms over how the choice of law issue would have been decided, the district court did not err in denying Indigo's motion for attorney fees.

## CONCLUSION

For the foregoing reasons, the district court's judgment of no liability in favor of Indigo is affirmed.  The order of the district court denying attorney fees is also affirmed.

## AFFIRMED

## COSTS

Each party is to bear its own costs.